IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Brief June 14, 2012

# IN THE MATTER OF S.J., C.J., AND J.J.

### Appeal from the Shelby County Circuit Court
### Nos. CT-002466-10, CT-002468-10    Robert S. Weiss, Judge

### No. W2011-01690-COA-R3-JV - Filed August 9, 2012

This appeal arises out of dependency and neglect proceedings. The respondent mother has three children, one an infant. The infant suffered numerous unexplained injuries and was diagnosed with failure to thrive. The Tennessee Department of Children's Services filed a petition to have all three children declared dependent and neglected, and alleged severe child abuse as to the infant. The trial court declared all three children dependent and neglected, but declined to find severe abuse. The respondent mother now appeals the trial court's finding of dependency and neglect, and the Department of Children's Services appeals the trial court's failure to find severe child abuse as to the infant. We affirm the trial court's finding that all three children were dependent and neglected, but find clear and convincing evidence that the infant suffered severe abuse; therefore, we reverse the trial court's finding on severe abuse.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed in Part and Reversed in Part

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

Andrew L. Wener, Memphis, Tennessee for Respondent/Appellant S.F.

Robert E. Cooper, Jr., Attorney General and Alexander S. Rieger, Assistant Attorney General Nashville, Tennessee for Petitioner/Appellee State of Tennessee Department of Children's Services.

# OPINION

## FACTS AND PROCEEDINGS BELOW

Respondent/Appellant S.F. ("Mother") and J.J. Sr. ("Father") have three children at issue in this appeal, two daughters, S.J. (born 2006) and C.J. (born 2007), and a son J.J. (born 2008). Mother and Father are not married to each other, but lived together with all three children. Father was employed and Mother was the primary caregiver.

In September 2007, when daughter C.J. was three months old, she sustained a skull fracture. Records indicate that C.J.'s skull was fractured on both sides of her head, and she had a contusion and bleeding on her brain. Given the severity of the injury, medical providers questioned whether the child could have sustained such a skull fracture in the way the parents claimed, from merely falling off a couch. The State of Tennessee Department of Children's Services ("DCS") took daughters C.J. and S.J. into protective custody and filed a petition in the Juvenile Court of Shelby County, Tennessee, to have them declared dependent and neglected. Tenn. Code Ann. §37-1-102(b)(12)(F) and (G) (2010). DCS furnished services to the family while the children were in protective custody. For a time, an aunt and uncle took custody of the children. Almost a year after the daughters were taken into protective custody, they were returned to Mother's custody and the petition was dismissed.[1]

Almost a week later, son J.J. was born. When J.J. was approximately two months old, Mother took him to the Women, Infants, and Children ("WIC") Clinic, where she obtained infant formula for him. Generally, when parents come to the WIC Clinic to obtain infant formula, their child undergoes a brief assessment by a nurse or other medical professional at the Clinic. Mother was told in that visit to WIC that J.J. was significantly underweight and that she should bring the child to be examined by his physician. She did not do so.

When son J.J. was four months old, Mother again brought J.J. to the WIC Clinic. Apparently very concerned at how underweight J.J. was, personnel at the WIC Clinic advised Mother that J.J. needed to go immediately to the hospital. Mother brought J.J. to the emergency room at Le Bonheur Children's Medical Hospital ("Le Bonheur") to be assessed.

---

[1]The Juvenile Court's order is perplexing. It first sustains the original petition to find the children dependent and neglected and recites that the court had granted custody to the maternal aunt and uncle. It then states that the aunt and uncle informed DCS that they were no longer willing to take custody of Mother's daughters, and there were no other relatives willing to take custody. Then, without further explanation, the same order awards custody to Mother only, not to Father, and dismisses the petition.

When J.J. was admitted to Le Bonheur, he was examined by pediatrician Karen Lakin, M.D. ("Dr. Lakin"). Dr. Lakin found that J.J. had little subcutaneous fat and notable upper airway congestion. He was diagnosed with severe failure to thrive. Just as concerning, tests showed that the infant had numerous broken ribs in various stages of healing; the hospital radiologist reported that J.J.'s x-rays indicated that some of the injuries had occurred about ten days earlier, some about a month earlier. The parents gave no explanation for these rib fractures. Le Bonheur notified DCS and recommended a safety plan for infant J.J. and for his sisters, then one and two years old. DCS opened an investigation but, for reasons that are not apparent from the record, did not immediately remove the children from the home.

About a month later, while this DCS investigation was underway, five-month-old J.J. was transported by ambulance to the Le Bonheur emergency room. He was again seen by Dr. Lakin. Dr. Lakin determined that J.J.'s left leg had an acute proximal femur fracture, that is, his femur was severely broken and out of alignment. Father explained to the physician that he awoke to J.J.'s screaming; when he went to investigate, Mother was holding the screaming child. Mother told Father that J.J. had gotten his leg caught in the crib slats and Mother had pulled his leg out. The physician's report described these as "highly suspicious fractures."

The next day, DCS filed a dependency and neglect petition as to J.J. and alleged "severe child abuse" pursuant to Tennessee Code Annotated §§ 37-1-102(b)(1), 37-1-102(b)(12)(F), 37-1-102(b)(G), and 37-1-102(21)(A)[2]. The petition sought to take J.J. into DCS protective custody. The Juvenile Court granted temporary custody of J.J. to DCS the day the petition was filed. On the same day, DCS filed a pleading to modify the existing dependency and neglect petition concerning sisters S.J. and C.J., seeking to take them into protective custody as well. The modified petition did not allege "severe abuse" as to S.J. and C.J. The Juvenile Court ordered the two sisters to be immediately taken into protective custody as well.

In May 2009, the Juvenile Court appointed James Sanders as guardian ad litem ("GAL") to represent all three children. Counsel was appointed to represent both Mother and Father.

On January 8, 2010, the Juvenile Court conducted a hearing on the dependency and neglect petitions.[3] The Juvenile Court sustained both petitions' allegation of dependency and

---

[2]While DCS cites Tennessee Code Annotated § 37-1-201(21)(A), this section has since been recodified as Section 37-1-201(b)(23)(A)(i). For clarity, we will refer to the "severe child abuse" definition currently found in Section 37-1-102(b)(23)(A)(i).

[3]The record is unclear as to whether the Juvenile Court conducted one hearing or two hearings on the same date.

neglect. As to J.J.'s failure to thrive, the Juvenile Court noted that, between birth and four months old, the child had gained only three pounds. J.J. readily gained weight in the hospital and there was no medical explanation for his failure to thrive while in the parents' care. It noted that J.J.'s rib fractures were unexplained and the leg fracture was not consistent with the parents' explanation of how the injury occurred. The Juvenile Court found that Mother and Father "are unable to properly care for [their] children due to the history of serious physical injuries to their children and the inadequate explanations that accompany these injuries." No specific finding was made on the allegation that J.J. had suffered severe abuse. Mother filed an appeal to circuit court for a *de novo* review of the Juvenile Court's decision.[4]

The dependency and neglect petitions for all three children were consolidated for trial before the Shelby County Circuit Court. After discovery, the trial was conducted on November 1, 2010, on the consolidated petitions.

The trial court heard testimony from Mother and two DCS employees. It also considered the deposition testimony of Dr. Lakin of Le Bonheur, and the children's medical records from Le Bonheur.

DCS investigator Tara Hibbler ("Hibbler") testified that she became involved with this family on March 27, 2009, when DCS received the referral from Le Bonheur after J.J. was diagnosed with failure to thrive and his healing rib fractures were discovered. Despite DCS's concerns for all of Mother's children, Hibbler explained that DCS was unable immediately to remove the children while it was investigating the situation.[5] Before DCS could complete its investigation, it received the second referral from Le Bonheur, only a month later, regarding J.J.'s fractured femur. In the absence of adequate explanation for the series of problems and injuries, DCS took all of the children into protective custody. Both parents were indicated for possible abuse in the investigation.

DCS family service worker Igina Perteet ("Perteet") testified as well. At the time of trial, Perteet had worked with the family for about seven months. She said that Mother has regular, twice monthly visitation with the children, and Mother and Father had recently moved into an apartment. Perteet testified that four-year-old S.J. has developmental delays, and three-year-old C.J. has speech and hearing issues. J.J's femur fracture left him with one leg longer than the other; he will be evaluated regarding surgical corrections when he is

---

[4]While Father was present at the Juvenile Court proceeding with appointed counsel, Father did not appeal the Juvenile Court's ruling to the circuit court and is not a party to this appeal.

[5]Hibbler did not explain how the ongoing DCS investigation hindered DCS from taking the children into protective custody at that time.

older. At the time of trial, J.J. was having difficulty walking. In terms of his cognitive development, at two years old, J.J. was not yet talking, but communicated mainly by shrieking. In foster care, all of the children's medical needs were being met and J.J. had "started picking up weight." In light of continued concerns for physical abuse and the parents' recent move into new housing, DCS recommended continued foster care.

Mother testified on her own behalf. After the removal of the three children at issue in this appeal, Mother told the trial court that she gave birth to another son on January 24, 2010. At the time of trial, Mother and Father had obtained a two-bedroom apartment. She claimed to be in job-training school and working toward obtaining her GED.

Mother acknowledged that she is a stay-at-home mother and was J.J.'s primary caregiver. Mother denied all allegations of physical abuse regarding any of her children; she said that she had never struck them and that she took care of their daily needs. Mother had no concerns that Father was abusing the children.

Mother explained infant J.J.'s diagnosis of failure to thrive by saying that she had been incorrectly mixing the infant formula provided to her by WIC. Mother testified that this was only a misunderstanding and that she never intentionally withheld food or nourishment from J.J. or from any of her other children.

Mother had no explanation for infant J.J.'s six rib fractures. She speculated that they occurred when she gave birth to him or "it could have been the way anyone picked him up." Mother denied breaking J.J.'s ribs and said she never saw anyone else do so.

Mother gave the trial court her explanation for infant J.J.'s acute upper femur fracture. Mother stated, "I seen [the child's leg] stuck in the crib" and that J.J.'s leg was stuck "just above his knee." When she saw it, Mother said, "I grabbed his leg, I pulled his leg out and I picked him up out of the bed." Mother explained: "His leg had got caught in the baby bed and I had pulled it out. I don't know if it's the way I pulled it out could have caused it, but his leg got caught in the baby bed."

Mother testified that once she removed J.J. from his bed, "[h]e was crying for a while and I was holding him. I had fed him then he went to sleep. After he woke up he was still hollering. So we checked his leg out and he wasn't moving it at all. . . ." After that, Mother said, "I called the ambulance." Mother said that Father accompanied J.J. to the hospital; she claimed that she did not immediately go to the hospital "[b]ecause earlier that day they had -

- well, that was our last day to pay the light bills, so I told them after I paid the light bill so the lights won't be off, I would come right after that."[6]

Mother acknowledged that daughter C.J. had suffered skull fractures but denied that it resulted in bleeding on her brain. Apparently to explain how the child could have suffered skull fractures on both sides of her head, Mother testified: "She had fallen off the couch when she was a month [old] and we were staying with his sister. And then she had fallen off the couch again a month later." Additionally, Mother acknowledged that she had been told that daughter S.J. was developmentally delayed, but said that S.J. did not seem developmentally delayed to her. Mother asked the Juvenile Court to return the children to her custody.

In addition to hearing the witnesses' in-court testimony, the trial court reviewed the deposition of Dr. Lakin, J.J.'s treating physician at Le Bonheur, and J.J.'s medical records from Le Bonheur. Dr. Lakin first treated J.J. in March 2009, when the WIC Clinic directed Mother to bring J.J. to the emergency room to be evaluated for his extreme underweight. She treated J.J. at Le Bonheur a month later when J.J. was brought by ambulance to the emergency room for what turned out to be a fractured femur. As background, Dr. Lakin said that J.J. was born at a normal weight, and tests for any bone disease that would cause increased vulnerability to broken bones came back negative.

At birth, J.J. weighed six pounds, five ounces, at around the 25th percentile on the infant growth chart. Dr. Lakin's record indicates that J.J. was not taken to a physician for his two-month checkup, even though the WIC Clinic told Mother when J.J. was two months old that the child was underweight and needed to be seen by a physician. By March 2009, when J.J. was brought to Le Bonheur at four months old, he weighed only nine pounds, four and a half ounces; since birth, he had gained only three pounds. At that weight, J.J. was "off the growth chart," below the 3rd percentile. He had "little subcutaneous fat." His height was likewise below the 3rd percentile, and his head circumference was at approximately the 10th percentile. J.J. was tested for any medical condition that would have prevented him from absorbing calories he was taking in; no medical reason was found for his failure to gain weight. Dr. Lakin said that the process for normal growth for an infant such as J.J. was simple: "Calories go in, baby grows, you don't have to do anything else." She noted that J.J. "actually gained quite well during his hospitalization." Dr. Lakin explained her concerns for a very young infant diagnosed with failure to thrive:

---

[6]Mother testified that she eventually went to Le Bonheur, but Dr. Lakin said she saw only Father. As discussed *infra*, the history Dr. Lakin took from Father indicated that even after the parents realized J.J.'s leg might be broken, Mother did not want to take the child to the hospital.

[A]ny deprivation [of] nutrients to your brain during that most critical point of growth during that period of time can affect brain development . . . . [O]verall development in terms of both motor and cognitive development when you have a child that is being deprived of appropriate nutrients can be affected. And by that I mean he may be delayed, of course . . . . [B]ut most important[] is the cognitive development and what [e]ffect that's going to have.

. . . [W]e don't know even now how that has affected him and may not ever know how that has affected him. But if he should have grown up to be a lawyer and instead he grows up and he is bagging groceries we don't know if . . . you could have treated that [e]ffect. All we know is that . . . children that are subject to failure to thrive for significant periods of time, they do take a hit cognitively because they are not getting nutrients to the brain.

Asked by Mother's attorney if it was fair to say that we do not know who caused J.J.'s failure to thrive, Dr. Lakin rejected that assertion: "Actually, it is not a fair statement. Whoever is caring for the child is responsible for making sure the child receives nutrition . . . . [I]f you're caring for the child and you're not giving the child calories, I would have to say that you're responsible for this child not growing."

Dr. Lakin testified at some length about J.J.'s rib fractures. During the March 2009 trip to Le Bonheur at which J.J. was diagnosed with failure to thrive, an initial routine chest x-ray revealed a fracture in one rib on the left and deformity of two ribs on the right. This unexpected discovery prompted a skeletal survey that revealed a total of six healing rib fractures. Dr. Lakin's report states: "Skeletal survey revealed posterior left 8th, 9th, and 10th healing rib fractures, and right, 5, 6, 7, and 8th lateral older fractures," that is, three back fractures on the left and three additional older side fractures on the right. In her deposition, Dr. Lakin hedged a bit on whether the rib fractures happened at different times, noting that it was possible that the fractures had occurred at the same time and the child's bones had different healing rates.

Dr. Lakin said bluntly that there was no way that four-month-old J.J. could have inflicted such rib fractures on himself. Neither of the parents offered any explanation for them. Dr. Lakin testified to a reasonable degree of medical certainty that J.J.'s rib fractures resulted from "nonaccidental trauma," a term used by medical experts associated with child abuse, meaning an injury to a baby or child that cannot be explained by an accident that can normally happen to a child of that age and where the responsible adults have no viable explanation of how the injury occurred. She explained how posterior and lateral rib fractures, such as J.J.'s rib fractures, would occur in a very young baby:

[T]o get a rib fracture that's in the back or along the side, . . . you have something that compresses the rib cage, like somebody squeezing a baby really hard, front to back . . . .

* * *

That's what we typically see is that like if somebody gets really angry and they are holding a baby and they grip, such as in Shak[en] Baby Syndrome and we will see the posterior fractures. The lateral rib fractures . . . you might also see . . . from a direct blow or like somebody stepping on a baby. We can also see lateral fractures like if the baby falls and hits the edge of something . . . . But the posterior fractures are the ones that are more concerning because that is a very unusual place to fracture because it's back in the back which [] is relatively a stable place. It is right up against the spine so you don't expect [babies] to fracture anything along the spine unless there is something squeezing it.

Consistent with her testimony that the rib fractures resulted from nonaccidental trauma, Dr. Lakin's written report prior to J.J.'s discharge states: "The presentation of severe failure to thrive and multiple fractures is . . . most concerning for nonaccidental trauma."

Despite this notation in Dr. Lakin's report, J.J. was not taken into protective custody but was discharged from Le Bonheur to the care of Mother and Father. A month later, Dr. Lakin treated J.J. when he was brought by ambulance to Le Bonheur's emergency room, accompanied by Father but not Mother. The Le Bonheur records indicate that, the day before the incident, Mother called Father "to say the baby was fussy and 'annoying' her." In taking J.J.'s medical history, Dr. Lakin said, it was "really difficult to get very many answers out of" Father regarding what Mother had told him about the cause of J.J.'s leg injury. The Le Bonheur records recount the history Father gave Dr. Lakin:

According to the father he heard the patient screaming around 5:30 a.m. this morning. He went into the patient's room and said that [J.J.'s] mother told him the baby had gotten his leg tangled up in the rales [sic] of the crib. . . . [Father] was concerned that [J.J.] may have hurt his rib because he had been admitted to [Le Bonheur] last month and a rib fracture was found. His ribs seemed okay according to dad so he checked his legs. The right leg was normal according to dad and so he pulled on the left leg and [J.J.] screamed. Dad was concerned the leg was broken because he noticed swelling and said they needed to bring him to the hospital or call the ambulance. Mom told dad that she didn't want to go to [Le Bonheur] because they would get DCS involved. Dad called the ambulance. . . .

-8-

Asked to describe Father's demeanor when Dr. Lakin was trying to extract information on what had happened to J.J., Dr. Lakin testified:

> He was very quiet, extremely quiet. . . . I remember this very clearly because I thought it was very unusual, and I even spoke to him about it, and said this is the second time your baby has been in the hospital for fractures. And he really didn't respond. . . . He was very cooperative . . . [but] a lot of times when I would ask him questions, he would just say he didn't know. . . . He wasn't angry or anything like that. He was just extremely, extremely quiet.

Dr. Lakin characterized J.J.'s leg fracture as "a really significant fracture." She explained that J.J. was diagnosed with "an approximal transverse left femur fracture which was displaced." Translating, she explained that the fracture was "up high and transverse is completely across" the bone, the pieces of bone did not match, and the bone was "moved out of alignment." Dr. Lakin explained that J.J.'s femur fracture was not a "spiral" fracture, that is, a fracture that goes lengthwise on the bone, usually associated with torsion or twisting. J.J.'s fracture, she said, was "a straight across break . . . like you take a stick and you snap it." It was also not a typical accidental fracture that occurs in the middle of the bone, the "midshaft" of the femur, which is the "weakest point." Instead, J.J.'s femur fracture was up high, near the end of the femur bone. A fracture at the end of the bone, she said, is more likely to occur where there is direct trauma, such as "direct blows to the bone[]." Five-month-old J.J., Dr. Lakin said, could not have caused such a fracture on his own. Dr. Lakin testified that there was always "a possibility" that J.J.'s femur fracture resulted from the infant's leg getting wedged between the crib slats, adding, "It was up pretty high though." Fractures such as J.J.'s on the end of the bone, Dr. Lakin testified, "are typically . . . concerns for abuse." Asked if J.J.'s femur fracture resulted from nonaccidental trauma, Dr. Lakin responded: "That's our concern. [W]ithout a significant history to explain that type of fracture and in light of the previously diagnosed healing rib fractures, we were very concerned that this was not accidental trauma."

At the conclusion of the hearing, the trial court issued an oral ruling, sustaining the dependency and neglect petition:

> [Mother], unfortunately, you have had either – either something is going on in that home, or you've had just a ridiculously bad stream of luck, but the fact that – but we will find that he has been neglected within the law under TCA 37-1-102(b)(12)(F) and (G) because of the unexplained injuries sustained by [J.J.], the failure to thrive, the broken ribs, and then within a month while that investigation was still pending, for him to have a broken femur. Based on the nature of the break, based on Dr. Lakin's deposition and what her evaluations

were, I don't see that there was any reasonable explanation other than that there was neglect.

With regards to [C.J.] and [S.J.], I will also sustain the petition for dependency and neglect. Again, the problem is there is an environmental problem in this home.

A written order was entered on November 17, 2010, finding by clear and convincing evidence that all three children were dependent and neglected. The trial court's order relied extensively on the deposition testimony of Dr. Lakin, detailing in particular her opinions on J.J.'s diagnosis of failure to thrive, his unexplained rib fractures, and his fractured femur. The trial court also noted C.J.'s prior "unexplained skull fracture[s]." Given the seriousness of these injuries and the lack of reasonable explanation for them from the parents, the trial court concluded that sisters S.J. and C.J. were dependent and neglected as well. The trial court stated: "[S]omething very concerning is going on in the home of this family and without an adequate explanation for [J.J.'s] injuries, his sisters are also not safe if returned to the home." Thus, all three children were held to be dependent and neglected.

Mother filed a notice of appeal to this Court. Upon reviewing the trial court's November 17, 2010 order, this Court determined that the trial court's order was not final because the allegations of severe child abuse with respect to J.J. in the DCS petition had not been addressed. The cause was remanded to the trial court and the appeal was subsequently dismissed. On remand, the trial court held a hearing on June 20, 2011. On July 1, 2011, the trial court entered an order declining to find that J.J. had been subjected to severe child abuse, without elaboration. Mother refiled her appeal.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Mother argues first, that there is not clear and convincing evidence in the record to support a finding that any of her children are dependent and neglected. In the event that this Court affirms the trial court's holding that infant J.J. is dependent and neglected, Mother contends that the trial court erred in finding that S.J. and C.J. are dependent and neglected as well.

On cross-appeal, DCS argues that the trial court erred in determining that Mother did not commit "severe child abuse" as to infant J.J.

Under Tennessee Code Annotated § 37-1-129, dependency and neglect must be established by clear and convincing evidence. Tenn. Code Ann. § 37-1-129 (2010). Severe child abuse in a dependency and neglect proceeding must also be established by clear and convincing

-10-

evidence. ***Tenn. Dep't of Children's Servs. v. Tikindra G. (In re Samaria S.),*** 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." ***In re A.T.P.***, No. M2006-02697-COA-R3-CV, 2008 WL 115538, at *4; 2008 Tenn. App. LEXIS 10, at *13-14 (Tenn. Ct. App. Jan. 10, 2008) (citing ***State v. Demarr***, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9; 2003 Tenn. App. LEXIS 569, at *26 (Tenn. Ct. App. Aug. 13, 2003); ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002)). The evidence should produce a firm belief or conviction as to the truth of the allegations sought to be established. ***In re A.T.P.***, 2008 WL 115538, at *4; 2008 Tenn. App. LEXIS 10, at *14 (citing ***In re A.D.A.***, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); ***Ray v. Ray***, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001)). "In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is 'highly probable' as opposed to merely 'more probable' than not." ***In re M.A.R.***, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005) (quoting ***In re C.W.W.***, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000)). ***See also In re Samaria S.***, 347 S.W.3d at 200. The appellate court applies the clear and convincing evidence standard as follows:

> Under this standard of proof, the appellate court must "distinguish between the specific facts found by the trial court and the combined weight of those facts." ***In re Tiffany B.***, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007). The facts as found by the trial court are reviewed *de novo* on the record, presuming those findings to be correct unless the evidence preponderates otherwise. ***Cornelius [v. DCS]***, 314 S.W.3d [902,] 906-07 [(Tenn. Ct. App. 2009)]. Findings of fact based on witness credibility are given great deference and will not be disturbed absent clear evidence to the contrary. ***Id.*** Whether the combined weight of the facts, either as found by the trial court or supported by a preponderance of the evidence, establish clearly and convincingly that the parent committed severe child abuse is a question of law, subject to *de novo* review with no presumption of correctness. ***Id.***

***In re Samaria S.***, 347 S.W.3d at 200.

## ANALYSIS

A biological parent's right to the care and the custody of his child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions. ***Troxel v. Granville***, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000); ***In re Adoption of A.M.H.***, 215 S.W.3d 793, 809 (Tenn. 2007); ***Hawk v. Hawk***, 855 S.W.2d 573, 578-79 (Tenn. 1993); ***In re Giorgianna H.***, 205 S.W.3d 508, 515 (Tenn. Ct.

App. 2006).  While this right is fundamental and superior to the claims of other persons, it is not absolute.  *DCS v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004).  It continues without interruption only so long as the parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination.  *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002); *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004).

Our legislature has established the situations in which the rights of a biological parent may be limited.  *In re Samaria S.*, 347 S.W.3d at 201.  These limitations include circumstances in which a child is deemed to be dependent and neglected.  *Id.*  "Parents have a duty to provide, and children have a corresponding right to be provided with, a safe environment, free from abuse and neglect."  *In re H.L.F.*, 297 S.W.3d 223, 235 (Tenn. Ct. App. 2009); *In re R.C.P.*, M2003-01143-COA-R3-PT, 2004 WL 1567122, at *6; 2004 Tenn. App. LEXIS 449, at *21 (Tenn. Ct. App. July 13, 2004) (citations omitted).  The primary purpose of dependency and neglect proceedings "is to provide for the care and protection of children whose parents are unable or unwilling to care for them."  *DCS v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *9 n.11; 2005 Tenn. App. LEXIS 139, at *28 n.11 (Tenn. Ct. App. Mar. 8, 2005).

### Dependency and Neglect

Mother argues on appeal that the trial court erred in finding her three children dependent and neglected.  In the alternative, even if J.J. is determined to be dependent and neglected, Mother contends that the evidence in the record does not support a finding that sisters S.J. and C.J. were also dependent and neglected.

As to J.J., Mother's argument is centered on her explanation of J.J.'s injuries and his severely underweight condition.  Counsel for Mother points to her testimony that J.J.'s femur fracture must have occurred when the child got his leg caught in the slats of his crib and Mother pulled his leg out, and Dr. Lakin's testimony that this was "a possibility."  Mother's counsel also notes Mother's testimony that she was unaware of J.J.'s rib fractures until told the results of the hospital's skeletal survey.  Finally, Mother's counsel emphasizes a statement by Dr. Lakin in her deposition suggesting that Dr. Lakin did not know whether Mother should have known that J.J. was severely underweight.  From this, Mother argues that the evidence in the record on whether J.J. is dependent and neglected is not clear and convincing.

As to sisters S.J. and C.J., Mother's counsel contends that there was no evidence in the record of Mother's actions or inactions regarding her daughters; all of the evidence at trial focused on J.J.  Thus, Mother argues, DCS did not prove by clear and convincing evidence that S.J. and C.J. are dependent and neglected.

The trial court below found that all three children were "dependent and neglected" pursuant to Tennessee Code Annotated §§ 37-1-102(b)(12)(F) and (G), which defines a dependent and neglected child as follows:

> (12) "Dependent and neglected child" means a child:
>
> * * *
>
> (F) Who is in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals or health of such child or others;
> (G) Who is suffering from abuse or neglect;

Tenn. Code Ann. §§ 37-1-102(b)(12)(F) and (G)(2010). The term "abuse" is statutorily defined as:

> . . . when a person under the age of eighteen (18) is suffering from, has sustained, or may be in immediate danger of suffering from or sustaining a wound, injury, disability or physical or mental condition caused by brutality, neglect or other actions or inactions of a parent, relative, guardian or caretaker.

Tenn. Code Ann. § 37-1-102(b)(1)(2010).

We must respectfully reject Mother's arguments. The definitions of "abuse" and "dependent and neglected child" focus on the child's circumstances, not the state of mind of the caregiver. *See In re Samaria S.*, 347 S.W.3d at 204 n.23 ("Notably, general 'abuse' (which is not 'severe') does not necessarily involve any 'knowing' conduct."). It is undisputed in the record that newborn J.J. was terribly undernourished for the first four months of his life and suffered multiple unusual rib fractures that are completely unexplained. Mother's protestations that she misunderstood how to mix J.J.'s formula, was unaware that she was starving her newborn infant, and was unaware that his ribs had been crushed by compression are irrelevant to the finding of dependency and neglect. Clearly, J.J. suffered from both abuse and neglect and fits squarely within the definition of a dependent and neglected child under Sections 37-1-102(b)(12)(F) and (G).

Mother contends that there is no evidence in the record as to her care of S.J. and C.J., so the trial court could not have found them to be dependent and neglected. This, of course, is not true. The record shows that when sister C.J. was three months old, the same age as J.J. during his period of abuse and neglect, C.J. suffered skull fractures on both sides of her head. The record also includes Mother's rather improbable explanation that newborn C.J. sustained such skull fractures when she fell off a couch, and then fell off a couch again a month later, an explanation that was questioned by medical professionals who treated C.J.

But even if the record contained zero evidence on Mother's care of J.J.'s sisters S.J. and C.J., it would not matter. The statutory definition of a dependent and neglected child expressly addresses such circumstances; the definition includes any child who is "under such improper guardianship or control as to . . . endanger the . . . health of such child or others." Tenn. Code Ann. § 37-1-102(b)(12)(F). Given the abuse and neglect suffered by son J.J., it is clear that other children under Mother's care are "under such improper guardianship . . . as to . . . endanger the . . . health of such child . . . ." It would be anomalous indeed if DCS, after finding one child in a household had suffered abuse and neglect, was powerless under the dependency and neglect statutes to remove other children in the household. We reject this argument.

"Parents have a duty to provide, and children have a corresponding right to be provided with, a safe environment, free from abuse and neglect." *In re H. L. F.*, 297 S.W.3d at 235. We affirm the trial court's adjudication of all three children as dependent and neglected, as supported by clear and convincing evidence in the record.

### Severe Child Abuse

DCS argues that the trial court erred in failing to find that J.J. had suffered "severe child abuse" within the meaning of the applicable statutes. DCS focuses on J.J.'s unexplained rib fractures and his femur fracture, contending that they constituted severe child abuse perpetrated by Mother. It argues that the fractures are consistent with the definition of "serious bodily harm" as defined in Tennessee Code Annotated §§ 37-1-102(b)(23)(A)(ii) and 39-15-402(d) and justify a severe abuse finding. DCS emphasizes that Dr. Lakin testified to a reasonable degree of medical certainty that the rib fractures were the result of nonaccidental trauma, that there was no explanation for the rib fractures, that the newborn infant could not have caused the rib fractures himself, and that it was undisputed that Mother was J.J.'s primary caregiver.

As to J.J.'s femur fracture, DCS notes that the trial court appeared to base its decision, declining to find severe abuse, on Dr. Lakin's testimony that there was "always a possibility" that the fracture happened the way Mother described, simply an unfortunate accident that occurred when she pulled the infant's leg out of the crib slats. DCS acknowledges this testimony by Dr. Lakin, but argues that Dr. Lakin's testimony overall makes it clear that it is unlikely that the fracture occurred in this manner and more likely that it resulted from nonaccidental trauma, *i.e.*, child abuse. DCS also notes that "[t]his was not the first time that one of the children in this appeal had suffered severe bodily injury and [Mother's] explanation had been deemed inadequate by medical personnel." It points to evidence in the record stating that medical personnel who evaluated sister C.J.'s skull fracture on both sides of her head at three months old indicated that the severity of her injury was inconsistent with

Mother's explanation that C.J. just fell off a couch, twice. DCS also points to Mother's reluctance to seek medical care for J.J. in the wake of his femur fracture. In light of all of this, DCS contends that the trial court erred in declining to find severe child abuse.

In pertinent part, Tennessee Code Annotated § 37-1-102(b)(23) defines "severe child abuse" as:

> (A)  (i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;
>
> (ii) "Serious bodily injury" shall have the same meaning given in § 39-15-402(d).[7]
>
> (B)  Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct;

Tenn. Code Ann. § 37-1-102(b)(23)(A) and (B).

We have previously outlined the significant repercussions that flow from a finding of severe child abuse:

> A finding of severe child abuse has serious ramifications:
>
> A finding of severe abuse triggers other statutory provisions, including a prohibition on returning the child to the home of any person who engaged in or knowingly permitted the abuse absent consideration of various reports and recommendations. Tenn. Code Ann. § 37-1-130(c). Even with such consideration,

---

[7]Tennessee Code Annotated § 39-15-402(d) states: "'Serious bodily injury to the child' includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects."

No child who has been found to be a victim of severe child abuse shall be returned to such custody at any time unless the court finds on the basis of clear and convincing evidence that the child will be provided a safe home free from further such brutality and abuse.[8]

Tenn. Code Ann. § 37-1-130(d). Further, Tenn. Code Ann. § 37-1-130(g)(4)(A) provides that reasonable efforts to reunify a family are not required to be made if a court has determined that a parent has subjected the child or a sibling to severe child [abuse].

The most serious consequence of a finding that a parent has committed severe child abuse is that such a finding, in and of itself, constitutes a ground for termination of parental rights. Tenn. Code Ann. § 37-1-130(g)(4) ("the parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court.") The ground itself is proved by a prior court order finding severe child abuse, and the issue of whether abuse occurred is not re-litigated at the termination hearing.

*[DCS v.]M.S.*, 2005 WL 549141, at *10. Thus, if there is a finding of severe child abuse, under the statutes, DCS is relieved of the obligation to use reasonable efforts to reunify the child with the parent, it is more difficult for the parent to regain custody, and one ground for termination of the parent's parental rights is effectively established.

*In re Samaria S.*, 347 S.W.3d at 201.

This case presents a textbook example of the confluence of circumstances that are presented with unfortunate regularity in cases of alleged child abuse. A preverbal infant or child sustains serious injuries, the only witnesses to the injuries are the parents or caregivers who maintain that the injuries result from an innocent misunderstanding or inexplicable mystery, and testimony by medical personnel whose role is to opine as to the most likely cause of the child's injuries, not to identify the perpetrator. We will analyze the proof in this case, applying the clear and convincing evidence standard to the statutory definition of "severe child abuse." As explained below, the evidence in this record clearly and convincingly shows severe child abuse of infant J.J.

---

[8]We note that Section 37-1-130(d) has since been amended.

Under the clear and convincing evidence standard, it is important to "distinguish between the specific facts found by the trial court and the combined weight of those facts." ***In re Tiffany B.***, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007). Each specific underlying fact need only be established by a preponderance of the evidence. Such specific underlying facts include whether a particular injury suffered by the child was the result of nonaccidental trauma, and whether the caregiver's conduct with respect to the injury was "knowing." Once these specific underlying facts are established by a preponderance of the evidence, the court must step back to look at the combined weight of all of those facts, to see if they clearly and convincingly show severe child abuse.

It is also important to understand the threshold for finding that a parent or caregiver's conduct was "knowing." In child abuse cases, the parent or caregiver may deny that the injury was purposefully inflicted, and where the injuries are inflicted on preverbal infants and children, there is often no witness to the injury other than the parent or caregiver. The "knowing" element can and often must be gleaned from circumstantial evidence, including but not limited to, medical expert testimony on the likelihood that the injury occurred in the manner described by the parent or caregiver. Moreover, "knowing" conduct by a parent or caregiver is not limited to conduct *intended* to cause injury:

> The term "knowing" as used in Section 37-1-102(b)(23) is not defined by statute . . . . In the context of the dependency and neglect statutes, the term has been described as follows:
>
>> We consider a person's conduct to be "knowing," and a person to act or fail to act "knowingly," when he or she has actual knowledge of the relevant facts and circumstances or when he or she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to him or her.
>
> ***In re Caleb J.B.W.***, No. E2009-01996-COA-R3-PT, 2010 WL 2787848, at *5; 2010 Tenn. App. LEXIS 447 (Tenn. Ct. App. July 14, 2010) (citing ***In re R.C.P.***, 2004 Tenn. App. LEXIS 449, 2004 WL 1567122, at *7); ***see also In re H.L.F.***, 297 S.W.3d 223, 236 (Tenn. Ct. App. 2009).

***In re Samaria S.***, 347 S.W.3d at 206. In the case of ***In re Samaria S.***, the premature twin infants at issue were diagnosed with severe failure to thrive. The appellant mother had low intellectual functioning and argued that her failure to feed her premature infants correctly was not "knowing" because she did not have the intellectual ability to understand the hospital's feeding instructions or to grasp and appreciate the risk to her children. *Id.* at 205-06. The mother also testified that she in fact fed the children properly. *Id.* at 207. On

appeal, the Court affirmed the trial court's factual finding that the mother's conduct was knowing. Even given the mother's low intellectual capacity, she acted in reckless disregard of the hospital's painstaking instructions on how to feed the premature twin infants, and her patently false claim that she in fact fed them properly indicated that she acted in a "state of awareness." *Id.* at 206-07. The appellate court held that the combined weight of the specific facts showed clearly and convincingly that the infant twins were subjected to severe child abuse. *Id.* at 207.

With these standards in mind, we analyze the evidence in the case at bar. We look first at the evidence on J.J.'s rib fractures. Dr. Lakin's testimony was plain: the rib fractures were caused by nonaccidental trauma. Rib fractures along the infant's side, and especially rib fractures in the infant's back near the spine, Dr. Lakin said, had to result from substantial compression of the infant's rib cage, such as "somebody squeezing a baby really hard . . . ." Neither Mother nor Father offered any explanation, and of course newborn J.J. could not say who inflicted such fractures on him. But we need not have an admission by Mother or an eyewitness to find Mother responsible for J.J.'s rib fractures. The record indicates that only Mother and Father took care of J.J., and Mother conceded that she was the primary caregiver. "Serious bodily injury" to a child includes "a fracture of any bone," and Dr. Lakin's testimony establishes that J.J.'s rib fractures resulted from nonaccidental trauma in the form of very hard compression. Under these circumstances, the evidence preponderates in favor of a finding that Mother either knowingly inflicted the serious bodily injury on J.J. or knowingly failed to protect him from the serious bodily injury. *See* Tenn. Code Ann. § 37-1-102(b)(23)(A); *DCS v. Byrd*, No. W2011-01249-COA-R3-JV, 2012 WL 525518, at *3 (Tenn. Ct. App. Feb. 17, 2012) (citing medical testimony that posterior rib fractures in an infant "are very, very highly specific fractures for abusive trauma from front to back compression").

We look next at the evidence on J.J.'s diagnosis of failure to thrive. The record shows that J.J. began life at a healthy weight, in the 25th percentile for newborn infants. A mere four months later, he was "off the chart," below the 3rd percentile on the growth chart in both weight and height, with a head circumference only in the 10th percentile. Mother, unquestionably the primary caregiver, explained that this was the result of a simple misunderstanding on how to mix the formula provided to her by WIC.

Perhaps. It is worth noting that by the time J.J. was born, Mother was an experienced parent with two older children. Unlike the parent in *In re Samaria S.*, there is no evidence in the record that Mother's intellectual ability is so low that it would compromise her ability to understand how to mix infant formula or feed her child.

But even if the Court puts aside our skepticism of Mother's explanation and accepts it at face value, the evidence in the record preponderates in favor of a finding that Mother engaged in "knowing . . . neglect that is likely to cause serious bodily injury." Tenn. Code Ann. § 37-1-102(b)(23)(A). In this case, it is undisputed that when Mother brought two-month-old J.J. to the WIC Clinic to obtain infant formula, the Clinic personnel told her that J.J. was underweight, not gaining weight properly, and needed to be examined by a physician. It is also undisputed that Mother ignored this directive. As a result, by the time J.J. was transported to the Le Bonheur emergency room two months later, his weight had fallen through the floor of the infant growth chart, and his head circumference was alarmingly small. Thus, Mother continued to starve J.J., acting "either in deliberate ignorance of or in reckless disregard of the information that ha[d] been presented to . . . her." *In re Samaria S.*, 347 S.W.3d at 206 (quoting *In re Caleb J.B.W.*, 2010 WL 2787848, at *5). "She deliberately closed . . . her eyes to avoid knowing what was taking place." *In re R.C.P.*, 2004 WL 1567122, at *7 n.12; 2004 Tenn. App. LEXIS 449, at *25 n.12.

This Court has, on previous occasions, found that a parent's knowing failure to meet an infant's "basic life sustaining need for nutrition" can constitute severe child abuse. *See e.g., In re Keara J.*, No. E2011-00850-COA-R3-PT, 2012 WL 114163, at *9 (Tenn. Ct. App. Jan. 13, 2012). The evidence at trial showed that J.J., by that time two years old, was not yet talking, but communicated mainly by shrieking, indicating he in fact suffered developmental delay. *See In re Keara J.*, 2012 WL 114163, at *4, 9-10 (discussing the significance of diminished head circumference and failure to meet developmental milestones such as talking). The evidence in the record preponderates in favor of a finding that Mother knowingly neglected to meet J.J.'s "basic life sustaining need for nutrition . . . ," neglect that is likely to cause serious bodily injury. *See id.* at 9.

We consider next J.J.'s femur fracture. At the outset, we acknowledge that the trial court is charged with assessing the credibility of the witnesses, and except in rare instances, the appellate court gives great deference to the trial court's determination as to the witnesses' credibility. *Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007). In the instant case, the trial court expressly credited Dr. Lakin's expert testimony and relied on it in finding that Mother's children were dependent and neglected. Moreover, the trial court declined to credit Mother's assertion that her children's numerous injuries were simply the result of "a ridiculously bad stream of luck." Our analysis is premised on the trial court's assessment of the witnesses' credibility.

In declining to find severe abuse of J.J., the trial court below pointed out Dr. Lakin's testimony that it was "possible" that J.J.'s femur was fractured in the manner Mother described, *i.e.*, that J.J.'s leg became entangled in the slats of his crib and she inadvertently

injured him when she pulled his leg out of the crib slats.[9]  This portion of Dr. Lakin's testimony is noteworthy, but does not preclude a factual finding that J.J.'s femur fracture did not occur in the way Mother described.  To support a factual finding of nonaccidental trauma, the expert testimony need not exclude every other conceivable possibility; again, the standard of proof for the specific underlying facts in a dependency and neglect proceeding is a preponderance of the evidence.

To recap the evidence, Mother testified that J.J.'s leg became "stuck" in the crib slats "just above the knee" and the fracture occurred when she "pulled his leg out."  When Dr. Lakin testified that there was "always a possibility" that J.J.'s fracture occurred in this manner, she also added: "It was up pretty high though" and went on to explain why she thought the fracture did not occur in this manner.  Dr. Lakin said that the fracture in J.J.'s femur was not a spiral fracture that can result from twisting or torsion, nor was it a typical accidental fracture that occurs in the midshaft of the bone.  Either type of fracture would have been more consistent with Mother's description.  Dr. Lakin testified that J.J.'s femur fraction occurred very high, near the end of the bone, and was a straight-across break "like you take a stick and you snap it."  Such a fracture, she testified, raises concern for nonaccidental trauma because it is more likely to occur where there is direct trauma, a "direct blow[] to the bone[]."

When we juxtapose Mother's explanation against Dr. Lakin's testimony, and take care to consider Dr. Lakin's testimony as a whole, we must conclude that the evidence preponderates in favor of a factual finding that J.J.'s femur fracture did not occur in the manner Mother suggests but was the result of nonaccidental trauma.

We now step back to consider "the combined weight of the facts, either as found by the trial court or supported by a preponderance of the evidence," to determine whether they "establish

---

[9]The trial court noted this portion of Dr. Lakin's testimony in its order sustaining the petition for dependency and neglect.  However, as noted above, the trial court did not make an express determination as to severe abuse in this order, so the appellate court remanded the matter to the trial court for an explicit determination.  On remand, the trial court declined to hold that J.J. suffered severe abuse, but did not give a reason.  Putting the two orders together, we surmise that Dr. Lakin's testimony that Mother's version of events was "always a possibility" was the reason the trial court declined to find severe abuse, and we go on to decide the matter so as not to delay resolution of the status of these children.  We note, however, that Rule 52.01 of the Tennessee Rules of Civil Procedure requires the trial court to state expressly its findings of fact and conclusions of law, even where the parties do not request it.  Tenn. R. Civ. P. 52.01.  If the trial court fails to do so, its decision is normally vacated and the cause remanded for such findings and conclusions; however, the appellate court may, in some circumstances, "soldier on" in the absence of them.  *See Town of Middleton v. City of Bolivar*, No. W2011-01592-COA-R3-CV, 2012 WL 2865960, at *26 (Tenn. Ct. App. July 13, 2012).

clearly and convincingly that the parent committed severe child abuse." ***In re Samaria S.***, 347 S.W.3d at 200 (citing ***Cornelius***, 314 S.W.3d at 906-07). The underlying specific facts supported by a preponderance of the evidence are: (1) Mother knowingly failed to meet newborn J.J.'s basic nutritional needs, resulting in severe failure to thrive; (2) Mother either inflicted J.J.'s rib fractures by compression or failed to protect him from such nonaccidental trauma; (3) J.J.'s femur fracture did not occur the way Mother claims, but instead was inflicted by Mother by nonaccidental trauma. In looking at the combined weight of all of the facts in the record, we also consider Mother's improbable explanation that sister C.J. suffered skull fractures on both sides of her head as an infant by rolling off a couch, twice; Mother's reluctance to bring J.J. for medical treatment for a clearly serious injury to his leg; Mother's failure to accompany J.J. to the hospital to explain his injury to medical personnel for the supposed reason that she had to pay a light bill instead; and Father's uneasy uncommunicativeness when Dr. Lakin questioned him about J.J.'s femur fracture.

Even in the absence of an admission by Mother or direct eyewitness testimony, when we consider all of these specific underlying facts, there can be no mistake about the picture that emerges. The combined weight of these facts clearly and convincingly establishes that Mother committed severe abuse of her infant son J.J.

### CONCLUSION

In sum, we find clear and convincing evidence in the record to support the trial court's finding that children S.J., C.J., and J.J. were all dependent and neglected children, and so affirm that holding. We reverse the trial court's holding that the evidence does not support a finding of severe child abuse as to infant J.J. We hold that the evidence in the record clearly and convincingly establishes that Mother subjected her infant son to severe child abuse under Tennessee Code Annotated §§ 37-1-129(a)(2) and 37-1-102(b)(23)(A)(i).

The decision of the trial court is affirmed in part and reversed in part, as set forth in this Opinion. Costs on appeal are assessed against S.F., for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE