IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 24, 2014

IN RE K.P. ET AL.

Appeal from the Circuit Court for Grainger County
No. 9077-III     Rex Henry Ogle, Judge

No. E2013-01636-COA-R3-JV-FILED-MAY 28, 2014

This is a dependency and neglect case. R.P. ("Mother") appeals the trial court's finding that she severely abused her minor daughter, K.P. The Department of Children's Services petitioned the juvenile court to declare K.P. and her sister, K.J. (collectively, "the Children") dependent and neglected.[1]  Following a hearing, the juvenile court found that the Children were dependent and neglected in the care of Mother and her then-boyfriend, B.J.[2]  The juvenile court further found that B.J. committed severe abuse against K.P.,[3] but that Mother did not. DCS appealed to the trial court. Following an adjudicatory hearing, the trial court found, by clear and convincing evidence, (1) that the Children were dependent and neglected and (2) that Mother committed severe child abuse against K.P. in that she failed to protect K.P. from abuse at the hands of B.J. Mother appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., C.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Robert M. Burts, Rutledge, Tennessee, for the appellant, R.P.

---

[1]Mother has two older children, W.M.W., Jr. and K.N.W.,who were also named in the initial petition. However, they are not a subject of the order now before us on this appeal.

[2]B.J. is the biological father of K.J. W.M.W., Sr., is the biological father of K.P., W.M.W., Jr., and K.N.W. W.M.W., Sr. voluntarily surrendered his rights to K.P. during the pendency of the juvenile court proceedings. Neither father is a party to this appeal and we refer to them only as is necessary to recite the underlying facts relevant to Mother's appeal.

[3]B.J. did not appeal the severe abuse finding.

Robert E. Cooper, Jr., Attorney General and Reporter; and Leslie Curry, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I.

Mother and B.J. were in a relationship "off and on" for some four years. In 2009, Mother left him after an incident in which he slapped two of her children, W.M.W., Jr. and K.J., in the face. According to Mother, she reported the incident to DCS a few weeks later. She testified that DCS told her there was nothing it could do because it had been too long and there was no proof. Mother said that she decided to make an effort to work things out with B.J. because, during their separation, B.J. completed parenting classes and counseling and a court order was entered that awarded her and B.J. joint custody of K.J. Mother explained she did not want to be separated from K.J., and had feelings for B.J. Thus, she reunited with B.J. after nine months apart.

On March 25, 2011, Mother gave birth to K.P.[4] Both Mother and the newborn child tested positive for oxycodone. The child had to be transported to East Tennessee Children's Hospital for treatment of her symptoms of drug withdrawal including severe seizures. In March 2011, DCS filed a petition to declare the Children dependent and neglected. The Children were placed in the temporary custody of a maternal aunt. On April 26, 2011, following a status hearing, the court ordered custody of the Children returned to Mother.

On November 17, 2011, Mother, B.J., and the Children had lived together in a motel room for the past week. K.J. was nearly three and K.P. was seven months. When B.J. arrived home from work, Mother smelled alcohol on his breath. B.J. told her he had a shot of alcohol. Around 6:30 p.m., Mother left the Children in B.J.'s care when she went to work. Mother arrived home three hours later to find K.P. playing in her car seat. She turned on the lights and "straight away" saw that K.P. was injured with "a little swelling" around her left ear. Mother took the child to the emergency room where K.P. was found to have a skull fracture. In addition, the child had bruising to her forehead, left ear, scalp, chest, and legs. She also had swelling to the left side of her scalp, an abrasion to one finger, a torn frenulum,[5]

---

[4]B.J. was named as K.P.'s father on her birth certificate. During the course of these proceedings, testing revealed that W.M.W., Sr., is the child's biological father.

[5]A doctor described the frenulum as "the little piece of skin that connects your lip to the inside of your mouth."

red spots to the roof of her mouth, and swelling at the back of her throat. Caroline Johnson, a Child Protective Services investigator, arrived at the hospital. Mother reported she discovered bruising and swelling to K.P.'s head when she returned home from work. Ms. Johnson asked three-year-old K.J. what happened to her sister, to which K.J. replied, "Daddy did it." After several hours, K.P. was released from the hospital to Mother's custody. The next morning, the investigator spoke with B.J. by phone. He initially denied knowledge of any injury to either child. Later the same day, B.J. called Ms. Johnson to say that K.P. was injured when he fell while he was holding her.

On November 22, 2011, Ms. Johnson met with Mother and B.J. An immediate protection agreement was established which provided that Mother would retain custody of the Children provided that B.J. have no contact with them pending further investigation. The agreement further required Mother to bring K.P. for follow-up medical visits and to remain in contact with DCS. Mother did not return with K.P. for follow-up visits with the child's pediatrician or a neurosurgeon regarding her skull fracture. Later that evening, Mother was arrested and charged with assaulting B.J.'s mother. The paperwork made reference to other active warrants. Following Mother's arrest, DCS immediately removed the Children into protective custody. The Children entered foster care.

On November 28, 2011, DCS filed a petition for temporary custody of the Children and to declare them dependent and neglected in Mother's care. Finding probable cause, the juvenile court granted the petition. On October 2, 2012, an adjudicatory hearing was held in the juvenile court. Sandra Sewell, the Children's first DCS case manager, testified that when she spoke with Mother about the skull fracture, Mother began crying. Mother wanted her to know that B.J. had "laid his hands" on her other children. Mother added that B.J. "can drink at times and takes his Klonopin and sometimes becomes angry." Asked why she continued to leave her children with B.J., Mother told Ms. Sewell that she needed to work. Mother had no explanation for K.P.'s skull fracture. She surmised that the bruises and torn frenulum could have resulted from K.P. playing or being fed while in her "bouncy seat." Mother said that B.J. first told her that K.P. had fallen off a bed, but later said he had fallen while he was holding the child.

At the time of the hearing, Mother, age 29, was asked whether she now believed that B.J. had caused the injuries to K.P. Mother replied, "I don't think he did. But . . . I was not there." She testified that despite B.J.'s past actions and the injuries to K.P., she would continue to allow B.J. to care for the Children. She concluded, "[t]here are incidents, but none of them were life threatening." She added that even though B.J. had one drink that night, "he was coherent and very capable of taking care of the kids." In the past, when he did drink to excess, he would sometimes "become aggressive" – "verbally not physically" – toward Mother, but not the Children.

For his part, B.J. testified the incident with K.P. was an accident. He explained that he tripped over a walker while holding K.P.; they both fell and K.P. must have hit her head on a dresser. He said he didn't go into the hospital with Mother that night because he was upset himself and didn't think the child's injuries were "that bad." B.J. conceded he had once "smacked" Mother's son on his cheek, but denied ever striking K.J. He said he had since taken parenting classes and learned how to handle children.

Dr. Marymer Perales, an expert forensic pediatrician, saw K.P. at the hospital and concluded that K.P.'s injuries did not match the reported history of falling off the bed. In the doctor's opinion, K.P. sustained "non-accidental trauma." Dr. Perales opined, to a reasonable degree of medical certainty, that "some caregiver in this child's care, . . . knowingly used force on that child that would have caused bodily injury or death." She testified that although a skull fracture could result from a fall from a bed, that injury together with all of the other unexplained injuries, led her to conclude that something else had happened. She classified all of K.P.'s injuries as "acute." She further opined that the child could not have inflicted the injuries upon herself in the course of normal activities.

After the hearing, the juvenile court found that the evidence clearly and convincingly established that the Children were dependent and neglected and ordered that DCS retain custody. Further, the court found that K.P. was subjected to severe child abuse by B.J. More specifically, the court found that K.P. sustained "a skull fracture, multiple other injuries, and significant bruising while in the care of [B.J.]" and that B.J. failed to provide a sufficient explanation for the child's injuries. The court found that Mother did not commit severe child abuse, but ordered that the Children would remain in DCS custody pending a final hearing.

On April 8, 2013, the trial court held a de novo hearing in the dependency and neglect action including the allegation of severe child abuse. There was little variation in the testimony from that given in juvenile court. For her part, Mother testified that since the juvenile court hearing, she had reached the conclusion that B.J. did cause the skull fracture. She continued to assert that the frenulum tear could have happened while the child played in her bouncy seat. Mother testified that on November 17, B.J. "had about a shot" of alcohol, but conceded she wasn't sure of the number, and "it could have been two." She knew the Children would be safe in B.J.'s care because there was no alcohol in the motel room and that, from experience, she was able to judge his "mood." Mother admitted that B.J. had a history of alcohol abuse, a history of "violence" with her, and a history of slapping the children. In later testimony, Mother said there had been times in their relationship when B.J. drank too much, got angry, and the two would argue, but denied there had been any domestic violence. As to K.P.'s skull fracture, Mother testified that "it wasn't life threatening," then said she could "see where, yeah, it could be."

After the trial, the court found, by clear and convincing evidence, that the Children were dependent and neglected "due to the severe child abuse committed by [B.J.] against . . . [K.P.] and [Mother's] failure to protect the child from said severe abuse after being put on notice. . . ." The court expressly found that Mother committed severe child abuse against K.P., pursuant to Tenn. Code Ann. § 37-1-102(23)(A)(i). The court found that it was in the Children's best interest to remain in the temporary custody of DCS. Mother filed a timely notice of appeal.

II.

Mother raises a single issue for our review:

> The evidence was insufficient to support a finding of severe child abuse by clear and convincing evidence.

III.

With respect to dependency and neglect proceedings, we have observed:

> Under Tennessee Code Annotated § 37-1-129, dependency and neglect must be established by clear and convincing evidence. Severe child abuse in a dependency and neglect proceeding must also be established by clear and convincing evidence. "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." The evidence should produce a firm belief or conviction as to the truth of the allegations sought to be established. "In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is 'highly probable' as opposed to merely 'more probable' than not."

*In re S.J.*, 387 S.W.3d 576, 587 (Tenn. Ct. App. 2012)(internal citations omitted). We have further elaborated the standard of review as follows:

> Whether the ultimate issues of dependency and neglect or severe child abuse have been established by clear and convincing evidence are questions of law, which we review de novo with no

presumption of correctness. To the extent the trial court made findings of fact in support of the ultimate issues, we review the factual findings pursuant to Tenn. R.App. P. 13(d), de novo with a presumption of correctness unless the evidence preponderates otherwise. However, the trial court's conclusions of law concerning the ultimate issues are reviewed de novo without a presumption of correctness.

*Cornelius v. Dep't of Children's Servs*., 314 S.W.3d 902, 907 (Tenn. Ct. App. 2009).  In summary, "this Court will review the trial court's specific findings of fact in support of its ultimate conclusions de novo, pursuant to Tenn. R.App. P. 13(d), with a presumption of correctness; however, we will review those conclusions of law,  i.e., that the parents engaged in severe child abuse and that the children are dependent and neglected, de novo with no presumption of correctness." *Id.*

IV.

Mother challenges the trial court's finding that she severely abused K.P. by failing to protect her from the abuse inflicted by B.J.  Mother's argument is essentially two-fold: (1) there is insufficient proof that she allowed severe abuse against the child and (2) the injuries the child sustained do not constitute "severe abuse" pursuant to the relevant statutory definition.

The trial court found that Mother committed severe abuse pursuant to § 37-1-102(23)(A)(i).  That section defines "severe abuse," as applicable in juvenile court proceedings, as the "knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death. . . ."  Subsection (A)(ii) further provides that " '[s]erious bodily injury' shall have the same meaning given in § 39-15-402(d)."  In turn, Section 39-15-402(d) defines "serious bodily injury to the child" as including, but not limited to, "second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects."

In the present case, the trial court elaborated its severe abuse finding – as to Mother – as follows:

> The Court finds by clear and convincing evidence that severe child abuse, as defined in T.C.A. § 37-1-102(23)(A)(i), **has** been

> committed against . . . [K.P.], by her mother, . . . for the
> following reasons:
>
> [B.J.] previously abused both [Mother] and her children;
> however, [Mother] continued to stay with him and leave her
> children with him unattended. [Mother] admits that [B.J.] would
> become violent when he used drugs and alcohol; however, she
> left her children with him unattended when he was drinking and
> on drugs. As a result of leaving the child with [B.J.], [K.P]
> suffered a skull fracture at the hands of [B.J.]. [Mother] was put
> on notice by [B.J.'s] past actions of abuse toward her and her
> children that leaving a child or children in his control was
> dangerous for that child or children; and thus, [Mother] failed to
> protect her children from the severe abuse of [B.J.].

(Bold font in original.)

First, the evidence does not preponderate against the trial court's findings. The evidence at trial showed that Mother was aware of B.J.'s abusive actions toward her other children in the past. Mother had become aware of the risk of allowing B.J. contact with children more than a year earlier. He had slapped both three-year-old W.M.W., Jr., and K.J., only a year old, in the face. Mother conceded that B.J. abused alcohol and took drugs, and became "angry" and "aggressive" when he did so. She admitted she knew that B.J. had one or more alcoholic drinks on the night of November 17, but nevertheless decided to leave the Children in his care. As Mother saw it, she had judged him to be "very capable of taking care of the [C]hildren and . . . in his right mind" when she left. As Mother put it, "[w]hen you've been with somebody on and off for about four years, you can tell." Unfortunately, Mother was wrong.

Although Mother at first could offer no explanation for K.P.'s skull fracture, by the time of the hearing, she had come to believe that B.J. had inflicted the injury. On the record before us, the evidence preponderates overwhelmingly in favor of the trial court's conclusion that Mother severely abused K.P. as a result of her knowing failure to protect K.P. from severe abuse at the hands of B.J.

Next, Mother seemingly attempts to minimize the injuries inflicted upon K.P. in an effort to challenge the severe abuse finding. She asserts that the skull fracture the child suffered was "expected to heal without problem." We are unpersuaded by Mother's argument. In our view, lasting or permanent injury is not required to sustain a finding of severe child abuse. In the same vein, we have affirmed the termination of a mother's

parental rights based on her prenatal abuse of cocaine despite the fact that the children at issue suffered no  long-lasting effects of drug exposure.  *See*, e.g., ***In re Shannon P***., No. E2012-00445-COA-R3-PT, 2013 WL 3777174 (Tenn. Ct. App. E.S., filed July 13, 2013). In the present case, we conclude that K.P.'s skull fracture without more falls within the definition of "severe child abuse."   Mother's argument to the contrary is without merit.

V.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, R.P.  This case is remanded to the trial court, pursuant to applicable law, for enforcement of the court's judgment and the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., CHIEF JUDGE