IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 1, 2017

# IN RE ETHAN W., ET AL.[1]

**Appeal from the Circuit Court for Wayne County**
No. 4658    Stella L. Hargrove, Judge

_____

## No. M2016-02313-COA-R3-JV

_____

The Department of Children Services initiated a proceeding to declare the three minor children of Mother and Father dependent and neglected following the discovery of a sexual relationship between two of the children. The Juvenile Court adjudicated the children dependent and neglected, as did the circuit court in a *de novo* hearing on appeal. Upon our review, we conclude the record contains clear and convincing evidence that the children were dependent and neglected; accordingly, we affirm the judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Amy Long Schisler, Lawrenceburg, Tennessee, for the appellant, Kimberly W.

Richard Boehms, Hohenwald, Tennessee, for the appellant, Billy W., Jr.

Herbert H. Slatery, III, Attorney General and Reporter, and Michael C. Polovich, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I. FACTUAL AND PROCEDURAL HISTORY

Three children are the subject of this dependency and neglect case: Ethan, born March 2000; Makayla, born September 2002; and Tommy, born August 2003. Their

_____

[1] This Court has a policy of protecting the identity of children in dependency and neglect cases by initializing the last names of the parties.

parents, Kimberly W. ("Mother") and Billy W., Jr. ("Father") adopted the children at different times, and each child was younger than two years old at the time of his or her adoption.

On February 16, 2013, Billy, the fourth child and eldest brother, found Ethan and Makayla, who were then twelve and ten, respectively, having sex inside the family's home. Mother reported the incident to the Tennessee Department of Children's Services ("DCS"), whose subsequent investigation revealed that Ethan and Makayla had been engaging in sexual contact with each other for at least two years. DCS filed a Petition for Restraining Order and Ex Parte Order in Wayne County Juvenile Court on February 21 (Case 632), and the court entered an ex parte restraining order on February 22, directing that Ethan would reside with his maternal grandmother, Joyce S., and Makayla and Tommy would remain in the home pending further orders.[2] On March 26, the court entered a preliminary hearing order, with orders for the parents including:

> [Mother and Father] shall ensure that Ethan does not have any unsupervised contact with the minor children, Makayla and [Tommy]. Ethan's visits with the other child shall be strictly supervised with one or both parents in the room with Ethan and the children at all times.

On March 27, 2013, a petition alleging Ethan to be delinquent was filed in Juvenile Court (Case 12180). The record shows that on March 12, 2014, the Juvenile Court entered an order retiring the case, contingent on Ethan entering treatment as a sexual offender; the order also included conditions that Ethan would have no contact with Makayla and that they would live in separate homes.[3]

On November 6, 2014, the Wayne County Juvenile Court Youth Service Officer (YSO) filed a petition with the Juvenile Court of Wayne County to declare Makayla and Tommy dependent and neglected; the petition detailed reports of sexual and aggressive behavior in the home from February 16, 2013, through October 21, 2014 (Case 848). On November 12, the court issued an order placing Makayla and Tommy into DCS custody. A preliminary hearing was held on November 26, after which the court issued an order holding that probable cause existed that the children were dependent and neglected, prohibiting contact between Makayla and Ethan, and ordering temporary DCS custody to continue. On January 9, 2015, the YSO filed an amended petition that added Ethan to the pending petition; on January 21, DCS requested the court to review the status of all three children.

---

[2] Attached as an exhibit to the petition was an Immediate Protection Agreement entered into between DCS and the parents on February 16. In the agreement, the parents agreed to "become educated about sex abuse," to "supervise Ethan and Makayla," and to "take the children to counseling to address sexual abuse." There is no indication in the record that any orders in Case 632 were appealed to the circuit court.

[3] Proceedings in Case 12180 are not at issue in this case.

In due course, the Juvenile Court held an adjudicatory hearing, and on June 16, the court entered an order declaring the children dependent and neglected. Mother and Father appealed to Wayne County Circuit Court and in March and May of 2016, the circuit court held a *de novo* trial. On July 6 the court issued a memorandum opinion finding that the children were dependent and neglected; the memorandum opinion was incorporated into the final order entered October 3. Mother and Father appeal, asserting that DCS did not prove by clear and convincing evidence that Ethan, Makayla, and Tommy were dependent and neglected.

## II. STANDARD OF REVIEW

Dependency and neglect must be established by clear and convincing evidence. *In re S.J.*, 387 S.W.3d 576, 587 (Tenn. Ct. App. 2012) (citing Tenn. Code Ann. § 37-1-129). This standard of proof requires the evidence to eliminate any serious or substantial doubt about the correctness of conclusions arising from the evidence. *In re S.J.*, 387 S.W.3d at 587 (citing *In re A.T.P.,* No. M2006-02697-COA-R3-CV, 2008 WL 115538, at *4, (Tenn. Ct. App. Jan. 10, 2008)). This standard of proof is relevant to appellate review, where the reviewing court must distinguish specific facts found by the trial court from the combined weight of those facts. *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007) (*overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533, 555 n.34 (Tenn. 2015)). Specific fact findings are reviewed *de novo* with a presumption of correctness; this presumption can only be overcome when the evidence preponderates otherwise. *See* Tenn. R. App. P. 13(d). The combined weight of those facts is reviewed *de novo* without any presumption of correctness. *In re S.J.*, 387 S.W.3d at 588. Specifically, the ultimate issue of dependency and neglect as established by clear and convincing evidence is a question of law, and will be reviewed as such. *Cornelius v. State Dep't of Children's Servs.*, 314 S.W.3d 902, 907 (Tenn. Ct. App. 2009).

## III. ANALYSIS

In the memorandum opinion, the court recounted the case's procedural background, the circumstances that caused DCS involvement, each child's specific circumstances and history, and the testimonies at trial; the court then held:

> The Court finds the children were dependent and neglected at the time of the filing of the original Petition and disposition in Juvenile Court. The Court finds the children are dependent and neglected at the time of the appeal and the instant hearings. The children remain dependent and neglected.
>
> The Court finds [that despite] the parents' statements that they now know Makayla was not a victim of sex abuse by Ethan, their actions, demeanor,

- 3 -

and attitude indicate otherwise.[4] [Mother] still blames Makayla. [Mother] blames DCS for removal of the children from the home. [Father] still blames Makayla, as well as DCS. All three of these children remain victims of serious parental neglect.

While the sexual activity between Ethan and Makayla may have increased beginning in 2009 when [Mother] became ill, the problems in this home began as early as 2006, when inappropriate sexual behavior began with Billy. The Court questions how these parents could have missed sex acts occurring frequently in the trailer between Ethan and Makayla for some two years. Both [parents] are so preoccupied with blaming Makayla, as well as DCS, they have lost sight of placing any blame on themselves. They accept no personal responsibility. Neither one of them admits to having a clue of inappropriate sex acts, including intercourse, occurring right under their nose, for some two years. Neither one of them comprehends the magnitude of the issues these children have faced and the seriousness of their mental problems. There is an absolute lack of parenting skills. There is an absolute lack of parental concern, involvement and supervision. It is amazing to the Court that [Mother or Father] were ever approved as foster parents of these children.

The Court finds DCS has carried its burden of proof pursuant to Tenn. Code Ann. 37-1-102(b)(12)[5] as follows:
The parents, by reason of cruelty, mental incapacity, immorality, and/or depravity are unfit to properly care for the children;
The children, while in the care of the parents, are under unlawful or improper care, supervision, custody and/or restraint;
The children, because of lack of proper supervision, are found in any place, the existence of which is in violation of the law;
The children are in such condition of want or suffering and/or under such improper control as to injure or endanger their morals or health; and
The children are suffering from abuse and/or neglect.

Each of these children remains in need of serious counseling and treatment. Each of these children remains in need of protection. Neither parent has any idea of when their child needs protection; neither parent has any idea of how to protect their child. Neither parent appreciates the seriousness of the mental health issues and inappropriate behavioral issues of any of the

---

[4] Reading this statement in context, it is obvious that the court omitted the words "that despite" from the text.

[5] The definition of "dependent and neglected child" was recodified to Tennessee Code Annotated section 37-1-102(b)(13), effective July 1, 2016.

children. Everything that has happened to the family and their children is the fault of DCS. The parents either accept no responsibility, or are incapable of recognizing and accepting any responsibility. The children are dependent and neglected.

On appeal, Mother and Father do not challenge the sufficiency of the evidence to support the circuit court's factual findings. Instead, they argue that use of the present tense in the statute belies the use of future or past circumstances as the basis for a current finding of dependency and neglect, and that there was no evidence of current dependency and neglect at the time of the trial and the court's ruling. The parents further argue that the children were in DCS custody when the trial took place and, since the statute does not apply into the future, the court cannot speculate on whether the children would be dependent and neglected if they were placed back with the parents. We respectfully disagree with this argument.

In making a determination of dependency and neglect, a court is to focus on circumstances that exist at the time of the *de novo* hearing. *Cornelius,* 314 S.W.3d at 906.[6] However, the past can be a relevant indication of a parent's fitness: "The courts may and should consider past conduct to the extent that it assists in determining a person's current parenting skills or in predicting whether a person will be capable of having custody of a child." *Ray v. Ray*, 83 S.W.3d at 734. Thus, "present and anticipated circumstances" are considered as well as "the parties' current fitness to be custodians of children." *Id.*

Having determined that Mother and Father's argument is without merit, we proceed to address the sufficiency of the evidence to support the findings of the circuit court. In contesting the adjudication of dependency and neglect, the parents rely heavily upon their own testimonies, as well as the testimonies of Leigh Anthony, Tommy's counselor at Parkridge Valley Hospital ("Parkridge"), a level four psychiatric hospital, and Chris Hendrick, the family's Adoption Support and Preservation Program (ASAP) therapist. However, the circuit court did not find these witnesses to be credible. On appeal, the circuit court's factual findings relying on witness credibility are given great deference; absent clear and convincing evidence to the contrary, such findings "are not to be disturbed." *In re Adoption of A.M.H.,* 215 S.W.3d 793, 809 (Tenn. 2007).

---

[6] As noted in *Cornelius*:

> [T]he circuit court in a dependency and neglect proceeding may not rely solely on the record made before the juvenile court, but under Tenn. Code Ann. § 37–1–159(c) must try the case *de novo* by hearing witnesses again and by rendering an independent decision based on the evidence received in the circuit court proceeding.

314 S.W.3d at 906 (internal citation omitted).

Youth Services Officer, Valerie Schabilion, testified as to the family history, including the DCS investigation; that DCS initiated its inquiry in 2013, discovered through forensic interviews that the sexual activity between Makayla and Ethan had been taking place for at least two years, and could have been taking place for up to four years. Consistent with this testimony, Father testified to the difficulties in the home after Mother had brain surgery in 2009, which required him to take a second job and be out of the home more frequently.

Mother testified to the household environment and sexual contact between Ethan and Makayla, which took place primarily at the family home, often when one or both parents were home. The mobile home has an open floorplan, with a main living area and hallway into which the bedrooms open; the parents testified that they had an open-door policy, which required all doors to be open unless the children were changing clothes. Mother testified that the sexual contact was discovered by Billy when he heard "noises" from another room and investigated; Mother was sitting on the couch at the time but was unable to see if the door was closed. Mother also testified to an incident where Ethan pulled down his pants in front of Tommy and asked him to engage in oral-genital contact, but she felt the behavior of the children was "ordinary" and that there were "no red flags."

In their testimony both parents avoided acknowledging the fact that the children were engaging in inappropriate sexual behavior in their home. Other witnesses testified that Mother did not realize that Makayla was a victim of sexual abuse; in the course of Mother's testimony however, she claimed to "understand" Makayla was the victim and Ethan was the perpetrator.[7] Father testified that he did not understand that the contact between Makalya and Ethan "was all sex—maybe touching involved and not sex," and that Makayla was lying in her statement that the sexual contact "had been going on a long time." As with Mother, in the course of his testimony, Father testified he "now believes [Makayla] to be a victim of sex abuse."[8]

With respect to the finding that Mother and Father did not have an understanding of the children's behavioral issues, Mother testified that, after the initial incident in 2013, "I didn't understand why [Ethan] needed to go into residential counseling since he was in counseling for victims." With respect to the finding that the parents did not take personal responsibility for the situation, Mother testified that "[i]t's DCS's fault. We needed family counseling and support; there was no guidance," and that "DCS screwed up and

---

[7] Consistent with its adverse credibility finding, the court found that Mother viewed Makayla as the aggressor despite Makayla's lack of sexual or physical development and, ultimately, blamed DCS and the brain surgery "for everything."

[8] Consistent with its adverse credibility finding, the court found that Father "ha[d] no concept of the seriousness of the sexual contact between Ethan and Makayla."

took [the] children." As further evidence of her lack of understanding of Makayla's need for professional assistance, Mother admitted that she unilaterally discontinued Makayla's therapy at A Kid's Place, a child advocacy center ("CAC"). In short, Mother defends her and Father's parenting, testifying that both parents "were on the right level of alert and everything [they] did was appropriate." With respect to the finding that Mother and Father do not comprehend the magnitude of the issues the children face and the seriousness of their mental problems, Mother testified that she believes that Makayla and Tommy are ready to come home simply because she and Father have further educated themselves in parenting skills and more open communication methods.[9]

Leigh Anthony testified that the parents did not have "an inkling" of the sexual conduct that was taking place in their home between the children, but should have; that testing showed that Tommy was emotionally disturbed; that prior incidents, as testified to by the DCS representative, included harm toward himself and others; that within six months of medication treatment for his mental and behavioral disorders, Tommy had made significant improvement but was being monitored every fifteen minutes in the highest level of the hospital. Conceding that Tommy is a completely different child in a highly structured environment like Parkridge and would require close monitoring if he were returned home, Ms. Anthony recommended that Tommy be placed back in custody of his parents; in testimony which the court found to be incredible, she described that Tommy's behaviors "are now level one."

We have also reviewed the testimony of Chris Hendrick, cited to support the argument the children should be returned to the parent's care. Mr. Hendrick described his duty to preserve the adoptive family unit and lamented the family's inability to discuss the issues as a family unit and the parents' inability to talk to Makayla and Ethan about the sexual contact, due to the court restrictions. While not related to a specific factual finding, but pertinent to Mr. Hendrick's recommendation that the children be returned home, the court held:

> The Court is not impressed with the testimony of Mr. Hendrick, and finds that he never had a full grasp of the facts in the case. He never had a full grasp of the Juvenile Court's intervention. The Court does agree with the following statements made by Mr. Hendrick: "I didn't have a clear picture of what was going on with Ethan at first; I did get it later through other providers." "They (the parents) didn't supervise enough to prevent this incident – this behavior." The court finds that Mr. Hendrick never had a full grasp of the "behavior" as well as the dynamics of this family.

---

[9] When she was questioned on what has changed to make theirs a safe home, Mother outlined a plan for more open communication between the family members.

Neither Mother nor Father has cited to clear and convincing evidence contrary to this determination.

Julia Bevis, principal of Waynesboro Middle School, testified that she discussed Tommy's and Ethan's general behavioral issues with the parents, as well as an incident on a bus involving Tommy's propositioning another student, but that "[t]here was no improvement from talking to the parents."

Lieutenant Donnie Carroll of the Wayne County Sheriff's Office, who investigated after the discovery of Makayla and Ethan's sexual contact, testified that two years was a long time for such behavior to continue without any parental knowledge.

Ann Marie White Murphy, Ethan's therapist at Cedar Grove Residential Treatment Center ("Cedar Grove"), testified that Ethan still does not take responsibility for sexually abusing his sister and that psycho-evaluations indicate that he is highly likely to reoffend, as Ethan's sexually aggressive behavior continued at Cedar Grove; that the parents assigned some responsibility to Makayla, as evidenced by Mother's banning of Makayla from being alone with Father, despite therapists and DCS workers affirming that he was a proper supervisor.

Deborah Bottom, a DCS Family Service and former Child Protective Services worker ("CPS") who has known the family since 2006, testified to a DCS referral involving issues with Billy excessively masturbating or being naked in front of the other children in the home; that, at the time of the referral, the parents were aware of Billy's past history of sexual abuse; and that DCS advised Mother to monitor the children more closely.

Dawn Bradley, an investigator for DCS and CPS, testified to receiving six referrals on the family, all related to incidents of sex abuse, including the school bus incident where Tommy allegedly made sexually explicit statements to a child and another referral in which it was alleged that Makayla and Ethan watched a pornographic video with an aunt, who is a registered sex offender, at the aunt's home.

Kesha Smotherman, Makayla's CAC therapist testified that Mother insisted that Makayla was provoking Ethan; that Mother expressed concern about Makayla being alone with Father, fearing that Makayla "may try to seduce" Father; that Mother frequently reported behavior of Makayla that Mother found to be "seductive"; that caseworkers and therapists had told Mother that her blaming of Makayla was unreasonable and upsetting to Makayla, but the instructions had no effect; that Mother and Father frequently cancelled or missed appointments and that a caseworker often brought Makayla to counseling sessions instead of the parents; and that Mother requested that CAC services for Makayla be discontinued, until the court ordered that Makayla return to treatment.

Robert Johannes, a therapist who counseled Tommy on an outpatient basis before Tommy's admission to Parkridge, testified to Tommy's behavioral issues. Mr. Johannes described the parents as cooperative, but believed they could have prevented further damage to the children by seeking more help and taking more action. He also testified that, over the course of his work with Tommy, the parents missed appointments and "took steps in the wrong direction."

Erica Ivey, a therapist for Tommy employed by LifeCare Family Services, testified Tommy missed appointments, which interfered with his therapy, and that the parents were not meeting all of Tommy's emotional needs.

Elizabeth Thompson, a community support specialist case manager employed by Centerstone Medical Center who worked with the family, testified that Tommy needed more intensive services.

We have determined that the foregoing testimony is clear and convincing evidence in support of the factual findings of the court.

Dependency and neglect proceedings function primarily to "'provide for the care and protection of children whose parents are unable or unwilling to care for them.'" *In re S.J.*, 387 S.W.3d at 588 (quoting *DCS v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *9 (Tenn. Ct. App. Mar. 8, 2005)). Ultimately, a dependency and neglect proceeding is not against the parents. *State Dept. of Children's Servs. v. Huffines-Dalton*, No. M2008-01267-COA-R3-JV, 2009 WL 1684679, at *7 (Tenn. Ct. App. June 15, 2009). Instead, the proceeding "is an inquiry to determine whether the child is dependent and neglected for any of the reasons enumerated by the statute . . ." *Id.* These statutory definitions of a dependent and neglected child "focus on the child's circumstances, not the state of mind of the caregiver." *In re S.J.*, 387 S.W.3d at 589.

According to the statutory definition, a dependent and neglected child is one:

(A)   Who is without a parent, guardian or legal custodian;

(B)   Whose parent, guardian or person with whom the child lives, by reason of cruelty, mental incapacity, immorality or depravity is unfit to properly care for such child;

(C)   Who is under unlawful or improper care, supervision, custody or restraint by any person, corporation, agency, association, institution, society or other organization or who is unlawfully kept out of school;

(D)   Whose parent, guardian or custodian neglects or refuses to provide necessary medical, surgical, institutional or hospital care for such child;

(E)   Who, because of lack of proper supervision, is found in any place the existence of which is in violation of law;

(F)   Who is in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals or health of such child or others;

(G)   Who is suffering from abuse or neglect;

(H)   Who has been in the care and control of one (1) or more agency or person not related to such child by blood or marriage for a continuous period of six (6) months or longer in the absence of a power of attorney or court order, and such person or agency has not initiated judicial proceedings seeking either legal custody or adoption of the child;

(I)   Who is or has been allowed, encouraged or permitted to engage in prostitution or obscene or pornographic photographing, filming, posing, or similar activity and whose parent, guardian or other custodian neglects or refuses to protect such child from further such activity; or

(J)(i)   Who has willfully been left in the sole financial care and sole physical care of a related caregiver for not less than eighteen (18) consecutive months by the child's parent, parents or legal custodian to the related caregiver, and the child will suffer substantial harm if removed from the continuous care of such relative;. . .

Tenn. Code Ann. § 37-1-102(b)(13).

While the court did not cite to the specific subsections, the bases upon which the children were declared to be dependent and neglected correspond to subsections (B), (C), (E), (F), (G). Mother and Father do not assert that these subsections are not applicable or not supported by the evidence in whole or in part but, as noted earlier, argue that the children were not dependent and neglected at the time of circuit court trial; we have addressed this argument earlier in this opinion and will not reiterate it here. We agree with the trial court that these are the subsections of the statute to which the evidence relates and, consequently, proceed to review the sufficiency of the evidence to meet the statutory criteria.

The testimony of the children's counselors, DCS workers and the parents themselves established the inability or unwillingness of Mother and Father to properly supervise the children; in addition, the failure of Mother and Father to accept responsibility for their own conduct—which allowed the situation to develop and continue—demonstrated that significant improvements would not be made to their

supervision. As Leigh Anthony testified, at the time of trial, Tommy required monitoring every fifteen minutes, and the parents have not demonstrated that they could meet this need. All three children are "under unlawful or improper care [or] supervision" within the meaning of Tennessee Code Annotated section 37-1-102(b)(13)(C), and are "suffering from abuse or neglect" within the meaning of subsection (b)(13)(G), because each remains in need of serious counseling, treatment, and protection. Clear and convincing evidence demonstrates that Mother and Father cannot meet such needs.

The testimony that Ethan and Makayla were left with their aunt, a registered sex offender, where they viewed a pornographic video supports the holding under subsection (b)(13)(E), that "because of lack of proper supervision,' they were "found in any place which is in violation of the law."

Relative to subsection (b)(13)(F), the evidence establishes that the parents did not understand, and thus adequately treat, the behavioral and emotional issues their children had. For example, at trial Mother referred to Tommy's alleged solicitation of sex to a four-year-old as "an inappropriate comment." Both parents testified that they felt that they could not prevent much of Tommy's behavior; when asked how they would provide a safe environment for the children, they reiterated a vague plan to increase lines of communication in the household. During the course of trial, when being questioned by her counsel, regarding the victim-perpetrator relationship between Makayla and Ethan, Mother was unable to understand that rape does not necessarily require accompanying violence, pointing to a larger misconception of the situation in the home. Similarly, Father acknowledged that he did not initially understand that Makayla was a victim and Ethan was a perpetrator and that he viewed Makayla as a seducer and feared that she might seduce him, as a consequence of which he did not stop Mother from blaming Makayla. The Youth Services Officer, Ms. Schabilion, noted that "it's [not] helpful for a perpetrator to have parents that are supportive of a perpetrator attitude." The evidence makes clear that Mother and Father did not fully understand each family member's role in these circumstances and continued to minimize each child's behavioral and sexual problems, and it supports the determination under subsection (b)(13)(F) that the children were "in such condition of want or suffering . . . as to injure or endanger [their] morals or health."

The evidence that Mother and Father blame Makayla as discussed above also exemplifies ongoing emotional abuse of Makayla and establishes the parents, "by reason of cruelty" are "unfit to properly care for" Makayla within the meaning of subsection (b)(13)(B). The court found that Makayla was "an innocent victim of rape and parental neglect" and "a little girl with absolutely no protection from her mother." The court found that Mother "continued to unfairly badger Makayla, naming her as a sexually active perpetrator in need of attention, control and punishment." Despite the parents' testimony at trial that they now understand that Makayla was a victim, the court found that "their actions, demeanor, and attitude indicate otherwise," and that both parents

continue to blame Makayla and DCS. The court noted this preoccupation with blaming Makayla caused the parents to "[lose] sight of placing any blame on themselves."[10]

The weight of evidence supports the circuit court's finding that the parents had failed to maintain a safe home for these children and still fail to recognize the underlying issues in the household—let alone effectively rectify those problems. Without such recognition and understanding of the catalysts that brought them before the court, it is difficult to see how the parents could improve the safety and fitness of the home for these children. Thus, we affirm the trial court's conclusion that Ethan, Makayla, and Tommy are dependent and neglected, within the meaning of Tennessee Code Annotated section 37-1-102(b)(13)(B), (C), (E), (F), and (G).

## IV. CONCLUSION

For the foregoing reasons, the judgment of the circuit court is affirmed; the case will be remanded to the Circuit Court for Wayne County with instructions to remand it the Juvenile Court for Wayne County.[11]

_____
RICHARD H. DINKINS, JUDGE

---

[10] The parents blame DCS, Makayla, and even the court system, as stated in Mother's Brief: "Juvenile court itself hindered the therapy of these children by placing restrictions on the contact between the children." There is no evidence in the record to support this assertion.

[11] In an addendum to her brief, Mother states that "As to Makayla, this appeal is moot. The parents surrendered their parental rights as to her on January 10, 2017." We also acknowledge that Ethan is no longer a minor. The effect of these matters can be addressed by the Juvenile Court on remand.