IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 7, 2023 Session

## IN RE DAKARI M.

Appeal from the Juvenile Court for Davidson County
No. PT263684     Sheila D. J. Calloway, Judge

_____

No. M2022-00365-COA-R3-PT

_____

A mother and a father appeal the termination of their parental rights. The juvenile court found clear and convincing evidence of four statutory grounds for termination of the mother's parental rights and five statutory grounds for termination of the father's parental rights. The court also determined termination was in the child's best interest. After a thorough review, we vacate and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Vacated and Remanded**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Nick Perenich, Nashville, Tennessee, for the appellant, Sabrina C.

Kelli Barr Summers, Brentwood, Tennessee, for the appellant, Dustan M.

Jonathan Skrmetti, Attorney General and Reporter, and Katherine P. Adams, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.**

**A.**

On December 1, 2016, the Tennessee Department of Children's Services ("DCS") petitioned for custody and emergency removal of Dakari M. (the "Child"). At that time,

the Child was living with his biological parents, Sabrina C. ("Mother") and Dustan M. ("Father"), and Tarasha L., with whom Mother and Father were in a polyamorous relationship. Two other children also lived in the home: an older half-sister ("Sister"), Mother's child from a previous relationship, and a younger half-sister born of Father and Tarasha L.

The petition alleged the Child was dependent and neglected due to the severe physical abuse of Sister. Sister's father and aunt had brought her to the hospital when they noticed she was bruised and walking with a limp. There, doctors found widespread bruising, ligature marks on her wrists and ankles, a burn on the back of her hand, and other unexplained injuries.

In 2019, the juvenile court held a consolidated dependency and neglect hearing for the Child and Sister. A doctor testified that Sister's injuries were inconsistent with accidental trauma. Mother testified that she did not know how Sister's injuries occurred but that the babysitter might have caused them. Father testified that he believed the babysitter burned Sister accidentally.

The court entered separate adjudicatory orders for the Child and Sister. The order as to the Child included a finding that Sister had suffered severe abuse while in Mother's custody. But it noted that the court "[could not] determine who specifically caused [Sister's] injuries." At the same time, it could not "exclude [Mother] or [Father] as perpetrators of the injuries." Because the Child was in the exclusive care and custody of Mother and Father at the time Sister sustained these injuries, the court adjudicated the Child dependent and neglected. The Child was placed in DCS custody pending a dispositional hearing.

With respect to Sister, the court initially found Sister was physically abused, but not a victim of "severe abuse." But it still adjudicated her dependent and neglected. She was placed in her father's custody. The court later rescinded this order. In a new "Order Clarifying Severe Abuse Finding," the court found "that [Sister] [wa]s a dependent, neglected, abused, and severely abused child pursuant to [Tenn. Code Ann. § 37-1-102](b)(27)(A) and (B)."

B.

On May 11, 2021, DCS filed a petition to terminate Mother's and Father's parental rights to the Child. As to both parents, the petition alleged abandonment by failure to establish a suitable home, persistence of conditions, severe child abuse, and failure to manifest an ability and willingness to assume legal and physical custody of the child. Additionally, as to Father only, the petition alleged abandonment by failure to support.

2

The juvenile court heard testimony from Mother, Father, the Child, the foster father, a family service worker with DCS, and an in-home care coordinator and case manager with Camelot Care Centers. Testimony about the Child largely focused on his relationship with his foster family. Testimony about the parents focused on their housing, employment, mental health, criminal history, and relationship with each other.

DCS called Father as its first witness. At the time, Father no longer lived with Mother or Tarasha L. He was primarily living in motels week-to-week. Still Father claimed he had periods of stable housing, but DCS never inspected those residences to determine if they were acceptable.

Father's housing instability was largely due to his lack of employment. He was employed with a moving company when the Child was first placed in foster care. Later, he unsuccessfully applied for Supplemental Security Income, or SSI benefits. He was in the process of appealing the denial of those benefits. He had not paid child support since the Child had been placed in foster care.

Father testified to suffering from congestive heart failure, hypertension, diabetes, anxiety, and depression. He took a variety of medications for these conditions. He was also diagnosed with bipolar disorder. But he did not feel he had a "disorder" and did not take medication to treat it. And while he had talked to a therapist at times, he had not spoken to the therapist in weeks. He felt it was not something he needed; he believed his depression would be cured when he regained custody of the Child.

Father also had a history of drug abuse, including cocaine and THC. He completed treatment for drugs and alcohol in August 2020. He testified that he had been clean for over four years at the time of trial. While he tested positive for marijuana in 2017, 2019, and 2020, he viewed his marijuana use as "medical." The family service worker agreed that he had not tested positive for drugs since she had been assigned to the case in 2021.

Father acknowledged a criminal history. But he saw being incarcerated "once or twice in [the past] five years" as an improvement because he "used to go to jail all the time for . . . small things." Yet he still faced a pending criminal charge for domestic violence against Tarasha L. In response to questions about those charges, Father declined to answer, invoking his Fifth Amendment privilege against self-incrimination.

DCS called Mother as its next witness. Mother had been living at the Salvation Army for approximately one year at the time of trial. She explained the Child could live with her there. And she had applied for federal rental subsidies. Although Mother admitted

3

she did not have stable housing throughout the entire case,[1] she testified that she had housing from May 2019 through March 2020. But it was no longer livable as a result of tornado damage. There was no evidence DCS ever inspected this location.

Mother was employed throughout most of the time the Child was in foster care. She was a prep cook at the time of the proceedings. Her gross income was approximately $800 per week.

Mother suffered from depression, post-traumatic stress disorder, and obsessive-compulsive disorder. She was not taking medication, but she was seeing a therapist. And she had gone to domestic violence counseling off and on for the past three years.

Mother admitted that she had used marijuana and cocaine with Father. She tested positive for these substances when the Child was first placed in foster care. But she never tested positive for cocaine again. She completed treatment for alcohol and drugs. The family service worker confirmed that Mother had not tested positive for drugs since she had been on the case.

Mother and Father gave conflicting testimony about the status of their relationship. Father testified that he currently lived with Mother. He hoped to marry her as soon as the next month. And he referred to her as "my wife." But Mother claimed she did not plan to continue any relationship with him other than a co-parenting one. She acknowledged physically violent altercations with Father in the past. But she had learned about "Stockholm Syndrome" through domestic violence classes, and she believed she had overcome it because she had not gone back to Father after leaving the shelter.

Still, the family service worker opined that Mother and Father "interact as a unit." Although Mother no longer lived with Father, she paid for his motels. He relied on Mother for medication. She gave him car rides. And she paid for things for him. Father described her as "basically my caregiver." The family service worker believed that Mother would allow the Child to see Father even if Father's parental rights were terminated "just because of the way that they interact so much like a family unit."

The case manager from Camelot testified that he saw Father have "negative interactions" and "get hostile" with Mother during visitation with the Child. And the parents sometimes smelled of marijuana. The case manager feared Mother would not be able to keep the Child safe because she was still connected with Father.

---

[1] Mother spent some time in a domestic violence shelter and had been incarcerated for some months. The record does not indicate the reason for Mother's incarceration. Mother claimed to have turned herself in to clear up her legal problems as a step toward reunification with the Child.

The family service worker and the Camelot case manager both believed permanency with the foster family would be best for the Child. The foster parents wished to adopt him. The Child called them "mom" and "dad." They were both educators, and his foster father was the principal of his school, where he was flourishing. He was a healthy, happy boy.

The court terminated both Mother's and Father's parental rights to the Child. It concluded that there was clear and convincing evidence of each statutory ground asserted by DCS. And clear and convincing evidence showed that termination was in the Child's best interest.

## II.

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). First, parties seeking termination of parental rights must prove the existence of at least one statutory ground for termination. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); Tenn. Code Ann. § 36-1-113(c)(1) (2021). If they prove the existence of one or more statutory grounds, they must then prove that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d at 546). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

We review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); TENN. R. APP. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97.[2] We review the trial court's conclusions of law de novo with no

---

[2] Mother argues that DCS must prove the underlying facts by "clear, cogent, and convincing evidence." *See In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *18 (Tenn. Ct. App.

presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

A.

The juvenile court relied on five grounds for termination of Father's parental rights and four grounds for termination of Mother's parental rights. But, on appeal, DCS does not defend the grounds of abandonment by failure to establish a suitable home or persistence of conditions as to either parent. And, as to Father, it does not defend the grounds of abandonment by failure to support or severe abuse. On review, we agree that DCS failed to establish these grounds for termination. Thus, we focus our analysis on the two statutory grounds for termination that DCS contends were supported by clear and convincing evidence.

1. Severe Abuse

The juvenile court concluded that termination of Mother's and Father's parental rights was appropriate under Tennessee Code Annotated § 36-1-113(g)(4). Under this ground, a parent's rights may be terminated if "[t]he parent . . . has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court." Tenn. Code Ann. § 36-1-113(g)(4).

Severe child abuse is "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death." *Id.* § 37-1-102(b)(27)(A)(i) (Supp. 2020). Conduct is "knowing" when a person "has actual knowledge of the relevant facts and circumstances or when he or she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to him or her." *In re Markus E.*, 671 S.W.3d 437, 461 (Tenn. 2023) (quoting *In re S.J.*, 387 S.W.3d 576, 592 (Tenn. Ct. App. 2012).

Here, two orders found that Sister suffered "severe abuse": the "Order Clarifying Severe Abuse Finding" and the adjudicatory order as to the Child. But neither of these orders found that Mother knowingly exposed Sister to abuse or neglect or failed to protect her. *See* Tenn. Code Ann. § 37-1-102(b)(27)(A)(i). The court could not determine the perpetrator of Sister's injuries. These orders were an insufficient basis for termination of Mother's parental rights. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004).

DCS makes the alternative argument that, even if the prior orders were insufficient, the juvenile court could make its own finding of severe child abuse based on Sister's

---

June 3, 2003) (J. Cain, concurring). But this Court is bound by the holdings of the supreme court on this point.

6

medical records and the deposition of a doctor who examined her. *See* Tenn. Code Ann. § 36-1-113(g)(4) (permitting the "court hearing the petition to terminate parental rights" to make the finding). But these documents are insufficient to make the necessary finding. *See In re Markus E.*, 671 S.W.3d at 466 (concluding that the structure of the termination of parental rights statute requires a finding that the parent either knowingly inflicted the abuse or knowingly failed to protect the child from abuse).

## 2. Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility for the Child

The juvenile court also found termination of Mother's and Father's parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(14). Under this ground, a parent's rights may be terminated if he or she "[1] failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody . . . of the child, and [2] placing the child in the [parent's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14). The statute does not define precisely the circumstances that might pose a risk of "substantial harm" to a child. *See id.* But the risk must come from the child's placement in the parent's legal and physical custody. *Id.* And the harm must be "a real hazard or danger that is not minor, trivial, or insignificant" and is "more than a theoretical possibility." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001). Both the failure-to-manifest and the substantial-harm prongs must be established by clear and convincing evidence. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

On the first prong, the court found neither parent manifested an ability or willingness to assume physical custody or financial responsibility of the Child. The parents had not maintained stable housing or a stable source of income. They also had not stayed out of legal trouble. We agree that clear and convincing evidence established that Mother and Father failed to manifest an ability or willingness to assume physical custody or financial responsibility.

On the second prong, the totality of the court's findings was that "placing the [C]hild in [Mother's and Father's] legal and physical custody would certainly pose a risk of substantial harm to the physical or psychological welfare of the [C]hild" and removing the Child from his stable foster home, where he has lived for several years, and "depriving him of the relationships he has developed with his foster family[,] would have devastating effects on the [C]hild." But the court did not identify the substantial risk that would come from placement with either Mother or Father.

Removing a child from a foster family in which the child has developed a strong bond can pose a risk of substantial harm. *See In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *17 (Tenn. Ct. App. July 22, 2020) (finding that a risk of

7

substantial harm existed if the child were returned to a parent who was a "virtual stranger" when the child had a strong bond with the current caregivers). But the substantial harm typically arises because the child has no bond or relationship with the parent. *See id.*; *In re Antonio J.*, No. M2019-00255-COA-R3-PT, 2019 WL 6312951, at *9 (Tenn. Ct. App. Nov. 25, 2019) (holding that substantial harm could be established when a child was removed from a home when very young, had no contact with the parent for more than a year following removal, and had nightmares out of fear of being removed from his foster family). Here, neither Mother nor Father were strangers to the Child. They regularly visited the Child. And the evidence demonstrated that the Child felt a bond with his biological parents as well as his foster parents.

The parental termination statute requires "an order that makes specific findings of fact and conclusions of law." Tenn. Code Ann. § 36-1-113(k). As our supreme court has observed, this Court "has routinely remanded contested termination cases to the trial court for failure to make findings of fact and/or conclusions of law, whether related to the grounds for termination or the child's best interests." *In re Angela E.*, 303 S.W.3d 240, 251 (Tenn. 2010); *see e.g.*, *In re Autumn D.*, No. E2020-00560-COA-R3-PT, 2020 WL 6306056, at *5 (Tenn. Ct. App. Oct. 28, 2020) (vacating the order on the failure to manifest ground for not including a specific finding regarding a risk of substantial harm and remanding for the trial court to make the necessary findings of fact and conclusions of law); *In re Mickeal Z.*, No. E2018-01069-COA-R3-PT, 2019 WL 337038, at *13 (Tenn. Ct. App. Jan. 25, 2019) (concluding that the court was "compelled" to vacate the order terminating parental rights and remand for an appropriate order when the trial court failed to make specific findings regarding each of the elements of a statutory ground for termination); *In re Haley S.*, No. M2017-00214-COA-R3-PT, 2018 WL 1560078, at *10 (Tenn. Ct. App. Mar. 29, 2018) (vacating the termination of parental rights and remanding for sufficient findings of fact and conclusions of law regarding the grounds for termination and the best interest of the child). Here, given that there is not clear and convincing evidence of any other statutory ground for terminating parental rights, we find it necessary to vacate the judgment terminating Mother's and Father's rights and to remand for findings of fact on the second prong of the failure to manifest ground. *See White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004) (recognizing that vacating and remanding is appropriate remedy for insufficient findings of fact and conclusions of law).

B.

Because we are remanding for findings of fact on a single statutory ground for termination as to both parents, we do not reach the issue of whether termination of parental rights is in the Child's best interests. *See* Tenn. Code Ann. § 36 1-113(c)(1) (requiring clear and convincing evidence of at least one statutory ground for termination of parental rights). Yet we note the juvenile court's factual findings on the Child's best interests were sparse, and it only applied seven of the statutory best interest factors. In at least one instance, the court applied a factor applicable under a former version of the best interests

statute. Effective April 22, 2021, the Legislature amended the list of statutory best interest factors. 2021 Tenn. Pub. Acts 509 (ch. 190). The amended version of the statute, containing a list of twenty best interest factors, is applicable here. *See In re Justin N.*, No. E2022-01603-COA-R3-PT, 2023 WL 8272174, at *12 (Tenn. Ct. App. Nov. 30, 2023) (explaining that the amended statute applies to termination petitions filed on or after April 22, 2021). In the interest of judicial economy, on remand, the court should reconsider its best interest analysis in light of the applicable best interest factors and enter an order "that makes specific findings of fact and conclusions of law." Tenn. Code Ann. § 36-1-113(k).

## III.

We conclude that the juvenile court's order contains insufficient findings to terminate Mother's or Father's parental rights for failure to manifest an ability or willingness to assume custody or financial responsibility for the Child. We further conclude that there is not clear and convincing evidence to support the other grounds for terminating parental rights. So we vacate the judgment terminating Mother's and Father's parental rights. The case is remanded for specific findings of fact and conclusions of law as required by Tennessee Code Annotated § 36-1-113(k) and such other proceedings as are necessary and consistent with this opinion.

_s/ W. Neal McBrayer_
W. NEAL McBRAYER, JUDGE
