N THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 1, 2024

FILED

AUG 3 0 2024

Clerk of the Appellate Courts
REc'd By _____

**IN RE MIA C.**

**Appeal from the Circuit Court for Hamilton County**
**No. 22A177  Mike Dumitru, Judge**

_____

**No. E2023-00828-COA-R3-PT**

_____

J. STEVEN STAFFORD, P.J., W.S., dissenting in part.

There is much in the Majority Opinion with which I agree, including the reprehensibility of Father's conduct toward Mother during their relationship and the inappropriate nature of his "discipline" of the Child. However, because the trial court relied heavily on witness credibility determinations in finding that the termination of Father's parental rights was not in the Child's best interest, I must respectfully dissent from the Majority Opinion's decision to terminate.

"Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases." *In re Addalyne S.*, 556 S.W.3d 774, 782 (Tenn. Ct. App. 2018). Under the clear and convincing burden of proof, our standard of review is somewhat different than the typical standard under Rule 13 of the Tennessee Rules of Appellate Procedure, requiring a distinction to be drawn "between the specific facts found by the trial court and the combined weight of those facts." *In re Markus E.*, 671 S.W.3d 437, 457 (Tenn. 2023) (quoting *In re S.J.*, 387 S.W.3d 576, 591 (Tenn. Ct. App. 2012)). As the Tennessee Supreme Court has explained, we first "review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it." *Id.* (citations omitted). We then must "determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence[,]" which is "a question of law, subject to de novo review with no presumption of correctness." *Id.* (citations omitted).

As the Majority Opinion correctly notes, the trial court is directed to consider the twenty non-exclusive factors contained in Tennessee Code Annotated section 36-1-113(i)(1) in determining a child's best interest.[1] As a result, determining a child's best

_____

[1] The trial court here entered an order containing detailed findings addressing each factor.

interest is a distinctly "factually intensive undertaking[.]" *In re Gabriella D.*, 531 S.W.3d 662, 682 (Tenn. 2017). Often, a trial court's assessment of the facts relevant to a child's best interest rest upon "a he said/she said dichotomy which, in turn, hinges upon an assessment of witness credibility." *Higdon v. Higdon*, No. M2019-02281-COA-R3-CV, 2020 WL 6336151, at *7 (Tenn. Ct. App. Oct. 29, 2020). If the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citations omitted); *see also Woodward v. Woodward*, 240 S.W.3d 825, 828 (Tenn. Ct. App. 2007) ("When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings."). So "[w]hen a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary." *In re Markus E.*, 671 S.W.3d at 457 (citing *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re Justice A.F.*, No. W2011-02520-COA-R3-PT, 2012 WL 4340709, at *7 (Tenn. Ct. App. Sept. 24, 2012)); *see also Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999) ("[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary.")

Like in many termination matters, the trial court's resolution of the best interest question was based, in significant part, on its credibility findings. As the Majority Opinion has emphasized, the trial court found that "Father's denial of abuse is not credible at all, for several reasons." Instead, the trial court relied upon Mother's testimony and other evidence in its determination that factor (N), involving brutality, abuse, or neglect by the parent against any child or adult, favored termination.

The trial court did not find Mother wholly credible, however. In its discussion of Father's lack of visitation with the Child, the trial court rejected Mother's explanations for her failure to comply with the supervised visitation ordered by the circuit court.[2] Although the Majority Opinion refers only to the "divergent" explanations offered by the parties, the trial court expressly found "Mother's testimony not credible on these points for three reasons." The trial court found that Mother (1) needed to accept "*some* responsibility" for her inability to accommodate the schedules of the other parties in setting visitation; (2) failed to explain why she scheduled two dental appointments on days set aside for visitation; and (3) admitted to SFS "that her conduct was driven at least in part by a desire

---

[2] As a reminder, Father completed his intake with SFS shortly after the circuit court's October 2020 order to do so. Mother acknowledged that she was contacted by SFS to attempt to set up visitation at some point in 2020, yet she admittedly took no steps to facilitate the court-ordered supervised visitation until being ordered to complete her intake in March 2022. Then, as the trial court explained in its order, "Mother failed to bring the Child to ten out of the first thirteen scheduled sessions, all of which Father attended. Mother blames SFS for failing to communicate and insists she did not bring the Child because she had medical issues and was fearful of the Child's safety."

to establish a stronger foothold in this litigation[.]"[3]

The determination that Mother was not credible in this regard led the trial court to find that "one of Mother's primary objectives was establishing a set of circumstances to prevent the Child from visiting with Father." This, in turn, led the trial court to find that factor (E), involving visitation, weighed against terminating Father's parental rights. Similarly, Mother's admitted efforts to prevent the Child from forming a relationship with Father influenced the trial court's finding that factor (D), relating to the reasonable expectation that the parent can create a healthy parental attachment with the child, also weighed against termination. I do not discern clear and convincing evidence in the record to support overturning the trial court's credibility determination as to Mother's intentional interference with Father's ability to enjoy visitation or form a healthy attachment with the Child. Given the trial court's clear and explicit credibility findings related to these factors, even applying the heightened standard of review applicable to termination decisions, I disagree with the Majority Opinion that these factors support termination.

The trial court's finding that Mother's interference was intentional also leads me to conclude that the Majority Opinion places too much emphasis on a few of the best interest factors in favor of termination, to the exclusion of those factors that weigh against termination. *See In re Gabriella D.*, 531 S.W.3d at 682 (noting that while one factor may prove determinative, this "does not mean that a court is relieved of the obligation of considering all the factors and all the proof.").[4] I agree that Father's past abusive behavior is a particularly important consideration in determining the Child's best interest; however, because of Mother's persistent efforts to prevent the Child from forming a relationship with Father, there is nothing in the record, other than the assumption that Father's past behavior will continue, to indicate that Father currently poses any threat to the Child.

---

[3] In a phone conversation with Andrea Chase on August 4, 2022, during which Ms. Chase attempted to have Mother bring the Child into the SFS building for a scheduled visit with Father, despite Father's stepchild being present, Mother stated:

> Because in my eyes, I'm going for termination in September and if you guys are allowing the stepmother and stepsiblings in there and you're reporting that there are bonds with other people, then that's not really gonna allow this termination to happen, so I'm protecting myself and I'm protecting my daughter and I'm going for the best outcome that I am hoping for in September, and that is, it, it clearly states in the termination that if there is not a bond with other grandparents, cousins, siblings, anybody else and there is not a significant bond with the other paternal figure, that, that's one of the requirements. I'm not going to sit here and just be okay with something that's not court order. If, if it's court ordered for a stepsibling to be there, then I would comply but it's not court ordered.

[4] While the Majority Opinion explains its reasoning as to the factors in favor of termination in great detail, it merely lists the factors that it concludes do not favor termination without elucidation. *Cf. In re Cartier H.*, No. M2022-01576-COA-R3-PT, 2023 WL 7158076, at *13 (Tenn. Ct. App. Oct. 31, 2023) ("[I]t is somewhat troubling that the trial court essentially chose to ignore all the factors that weighed even slightly in favor of Mother.").

Indeed, the trial court emphasized that its concerns regarding Father's ability to provide safe and stable care predated the termination of the parents' relationship and had mostly been remedied, even with Father's failure to complete the anger management class required as part of his domestic violence charge.[5] It was apparent that the Child was not afraid of Father during visitation at SFS. There was no indication that the Child has any specific needs, and the testimony was clear that Father has been able to meet the needs of his son and Stepmother's three children. By all accounts, Father maintains a strong bond with his son and is a positive presence for all of the children in his life. Thus, the home Father has established since his relationship with Mother ended appears suitable for the Child and the trial court found that several factors related to Father's current ability to provide an appropriate home environment for the child weigh against termination. *See* Tenn. Code Ann. § 36-1-113(i)(F) (involving the child's fear of the parent's home), (G) (involving whether the child's trauma is triggered by being around the parent or in the parent's home), (O) (involving the parent's prior provision of safe and stable care to any child), (P) (involving the parent's understanding of the child's basic needs), (Q) (involving the parent's commitment to having a home that meets the child's needs), (R) (involving the health and safety of the home). So while Father has not accepted responsibility for his previous bad behavior, it does appear that the trial court credited the evidence of the positive changes in his life—changes that he made without the necessity of outside intervention. *See **L.A.S. v. C.W.H.**,* No. E2021-00504-COA-R3-JV, 2022 WL 17480100, at *10 (Tenn. Ct. App. Dec. 7, 2022) ("Because the juvenile court's findings about abuse and neglect in Father's home are implicit credibility findings, and because the record does not contain clear and convincing evidence otherwise, we leave these findings undisturbed.").[6]

This correlates with Dr. Biller's opinion that a relationship may be so toxic that it causes a person to act in ways that he or she may not act outside of the relationship. The trial court placed great weight on Dr. Biller's testimony that, even if the allegations of abuse that Father denied or minimized were proven true, his recommendation would be that Father be allowed visitation in a therapeutically supervised setting to see if the relationship with the Child could be rebuilt before contemplating termination.[7] Although

---

[5] Father testified without dispute that he was excused from completing the class after Ms. Chase notified his probation officer that anger management was not necessary.

[6] The Majority Opinion highlights how the dramatic changes the mother in *In re Gabriella D.* made enabled her to reestablish positive relationships with her children. Unfortunately, the trial court in this case was afforded only a brief glimpse into the effect the changes in Father's circumstances had on his relationship with the Child as a result of Mother's interference. Not only did Mother refuse to cooperate with SFS to schedule visitation after the circuit court's October 2020 order establishing supervised visitation with SFS, Petitioners filed the termination petition shortly before a scheduled hearing after which, the circuit court indicated in its March 2022 order, Stepmother would take over supervision of the visits between Father and the Child. Then, Mother only brought the Child to four visits at SFS. So while Father's changes may have enhanced his ability to reestablish a positive relationship with the Child, Mother's behavior denied him the opportunity to show it.

[7] Dr. Biller also recommended that the Child be placed in counseling and Father be required to

- 4 -

the Majority Opinion concludes that this testimony should have been afforded less weight, this Court is simply not permitted to substitute its judgment for that of the trial court as to how much weight in-person expert testimony should be afforded. *See In re I.R.J.*, No. M2009-00411-COA-R3-PT, 2009 WL 4017168, at *15 (Tenn. Ct. App. Nov. 18, 2009) (noting that "[t]he weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility to be accorded will be given great weight by the appellate court" (quoting *State v. Robbins*, No. W2004-00487-COA-R3-PT, 2004 WL 2715334, at *11 (Tenn. Ct. App. Nov. 18, 2004))); *England v. Burns Stone Co.*, 874 S.W.2d 32, 38 (Tenn. Ct. App. 1993) ("Expert testimony is not ordinarily conclusive, but is purely advisory in character, and the trier of fact may place whatever weight it chooses upon such testimony and may retract it if it finds that it is inconsistent with the facts or otherwise unreasonable.").[8] I do not find clear and convincing evidence in the record to support disrupting the trial court's determination that Dr. Biller's testimony was credible and compelling, even with the caveat that he was not fully informed prior to trial. Thus, I disagree with the Majority Opinion's finding that factor (T), related to the parent's mental and emotional fitness to effectively care for the child, supports termination.

With my three deviations from the Majority Opinion's evaluation of the best interest factors, nine factors favor termination and nine factors disfavor termination. But, of course, determining a child's best interest does not entail simply conducting "a rote examination"

---

complete "a minimum" of twenty-four hours of anger management counseling.

[8] The Majority Opinion relies on *In re I.R.J.* for the premise that the weight to give an expert opinion may be reassessed on appeal based on the nature of the expert's knowledge. In that case, the juvenile court was faced with competing expert testimony regarding the mother's mental competence: the deposition of the mother's expert and the report and trial testimony of the State's expert. *In re I.R.J.*, 2009 WL 4017168, at *11–13. The juvenile court credited the State's expert and resolved the conflict in his favor, finding the mother incompetent. *Id.* at *13.

On appeal, this Court recognized "that trial courts have discretion to accept the opinion of one expert over that of another[,]" and determined that "the correct procedure here is to accord deference to the juvenile court's decision and to review [the mother's expert's] deposition testimony, along with the record, to determine whether it rebuts the finding [of the State's expert]." *Id.* at *14. We concluded that the "record confirm[ed] [the State's expert's] observation that [the mother's expert] relied solely on [the m]other's written responses to establish her social and personal history and reveals a number of important inconsistencies and omissions in the facts [the m]other reported to [her expert]." *Id.* at*15. Due to this less accurate depiction of the mother's history, the deposition testimony of the mother's expert did "not preponderate against the juvenile court's finding" that the mother was incompetent, and we found "insufficient evidence to reverse the juvenile court's findings of fact on this issue." *Id.* While we held that the trial court was free to afford less weight to expert testimony formed without "the full constellation of facts[,]" the question of whether the trial court's findings should be reversed for failing to do so was not presented in that appeal. Of course, "it is axiomatic that judicial decisions do not stand for propositions that were neither raised by the parties nor actually addressed by the court." *Staats v. McKinnon*, 206 S.W.3d 532, 550 (Tenn. Ct. App. 2006) (citing *Shousha v. Matthews Drivurself Serv., Inc.*, 210 Tenn. 384, 390, 358 S.W.2d 471, 473 (Tenn. 1962)). Here, the trial court heard the testimony of Dr. Biller, including what information was or was not presented to him by Father, and nevertheless decided to credit much of Dr. Biller's recommendations. Absent clear and convincing evidence to the contrary, I decline to invade the province of the trial court in reweighing this proof.

- 5 -

of each factor and then totaling the number of factors that weigh for or against termination. *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005). We must determine "whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence" that the Child's best interest would be served by terminating Father's rights. *In re Markus E.*, 671 S.W.3d at 457.

The trial court and the Majority Opinion clearly have a difference of opinion as to which factors should be given more weight. While the former placed more weight on Father's apparent progress and current ability to parent the Child, the latter places more weight on Father's past abuse and his refusal to take responsibility for it. I agree with the Majority Opinion that more work must be done by Father in order for him to have a conventional parent-child relationship with the Child. I recognize that in past cases, this Court has not looked favorably on a parent who needs additional time to complete the work necessary to foster a relationship with their own child. *See, e.g., In re Jayda H.*, No. E2019-00855-COA-R3-PT, 2019 WL 6320503, at *12 (Tenn. Ct. App. Nov. 25, 2019) ("[W]e are in agreement with the Juvenile Court that the child deserves permanency at this point. The child should not be left in limbo."). In the typical case, however, the parent's failure to complete steps toward reunification results solely from their own failure to do the work necessary to meet that goal. *See, e.g., id.* (involving a father who had "made less than satisfactory progress" addressing his unfortunate history with drugs).

Yet this is not the typical case. Rather, the analysis of Father's efforts is complicated by Mother's admitted interference in Father's ability to interact with the Child, as discussed above. Moreover, Mother's own statements demonstrate that her interference stemmed not from a reasonable fear of Father, but from a desire to gain a strategic advantage in this litigation. Thus, by giving Mother the very benefit that she sought—findings in her favor due to the Child's lack of visitation with and attachment to Father—the Majority Opinion tacitly approves of Mother's conduct intentionally flouting the circuit court's orders. *Cf. In re Chelbie F.*, No. M2006-01889-COA-R3-PT, 2007 WL 1241252, at *7 (Tenn. Ct. App. Apr. 27, 2007) (explaining that court orders are "designed to resolve disputes so that litigants do not resort to private remedies").

Moreover, to the extent that Father was permitted limited interactions with the Child, those interactions were generally positive.[9] Unlike other cases, there was no testimony that a gradual re-introduction of the parent-child relationship would cause the Child any specific emotional harm, only that it would be a shock for her to learn that Stepfather is not her biological parent. *Compare In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *19 (Tenn. Ct. App. July 22, 2020) (noting that the father

---

[9] Father and Mother did not interact during the visitation, and there was no testimony that Father ever directed hostility or poor behavior of any kind toward either Mother or the Child during the supervised visits. Mother took issue only with the fact that Father had attempted to have his stepson and wife participate in the visitation at times. Mother properly directed these concerns to SFS staff, rather than Father. SFS staff, however, did not deem Father's decision to bring his stepson or wife to the visitation to be an issue.

admitted that the child would be harmed by a reintroduction of father to his life, as father had no interaction with the child in several years). And all of the testimony about Father's current parenting skills showed him to be a good, proper parent. So too could a re-introduction to Father allow the Child to foster relationships with Elliott, her half-sibling, and Stepmother's children, her step-siblings. *See In re Jayden C.*, No. M2014-00957-COA-R3-JV, 2015 WL 1384346, *4 (Tenn. Ct. App. Mar. 23, 2015) (concluding that the presence of a half-sibling at a parent's home weighs in favor of that parent in the parenting plan context).

This Court previously concluded that termination was not in a child's best interest under similar circumstances in *In re Archer R.*, No. M2019-01353-COA-R3-PT, 2020 WL 820973 (Tenn. Ct. App. Feb. 19, 2020). In that case, the mother interfered with the father's ability to visit and parent his child. *Id.* at *1–3. We therefore held that while the father did not currently have a meaningful relationship with the child, this failure was not willful. *Id.* at *8. We further noted that due to the child's young age, the father could establish a meaningful relationship with the child in the future. *Id.* Finally, in affirming the trial court, we acknowledged the fact that termination would deprive the child of a relationship with his half-sibling, as well as the testimony from the father's girlfriend that he was a good and proper parent to the children in their home. *Id.* at *9. The same is generally true here.

Of course, the *In re Archer* case did not involve the substantiated allegations of abuse present in this case. Like my colleagues, I am incredibly troubled by Father's refusal to accept any responsibility for his role in the breakdown of the parents' relationship and his total lack of remorse for his violent behavior and the threats that he made toward Mother. But the best interest analysis recognizes that "[n]ot all parental misconduct is irredeemable" and that even parents who engage in bad conduct can do better. *In re Audrey S.*, 182 S.W.3d at 877 (noting that the termination statutes "recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests"). To be sure, "[d]ecisions regarding the termination or preservation of parental rights are neither a punishment to be meted out nor an award to be rendered to a parent." *In re Kaedince M.*, No. E2015-00763-COA-R3-PT, 2015 WL 6122776, at *7 (Tenn. Ct. App. Oct. 19, 2015). Moreover, "a decision not to grant a petition to terminate parental rights does not mean that custody of the child is returned to the respondent parent." *In re J.R.P.*, No. M2012-02403-COA-R3-JV, 2013 WL 4477860, at *10 (Tenn. Ct. App. Aug. 19, 2013). "The issue before us is confined to whether, under the circumstances of this case," the evidence supports a decision "to completely terminate the parent-child relationship." *Id.*

Father and his witnesses testified that Father was a good parent and that he would be a positive influence in the Child's life. While my colleagues and I might have made contrary findings on this issue given the evidence presented, the trial court chose to credit this testimony, despite Father's history of abuse. Although the heightened standard of review requires that we consider whether the combined weight of the facts amounts to clear and convincing evidence de novo, it does not give this Court carte blanche to overturn

factual findings or credibility determinations without sufficient evidentiary support. Indeed, "[t]he credibility of witnesses is a matter that is peculiarly within the province of the trial court." *In re E.L.R.*, No. E2014-00394-COA-R3-PT, 2014 WL 6735394, at *6 (Tenn. Ct. App. Dec. 1, 2014) (quoting *Lockmiller v. Lockmiller*, No. E2002-02586-COA-R3-CV, 2003 WL 23094418 at *4 (Tenn. Ct. App. Dec. 30, 2003)). I am unconvinced that the record in this case supports a deviation from this longstanding tradition of deference. *See Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998) ("One of the most time-honored principles of appellate review is that trial courts are best situated to determine the credibility of the witnesses and to resolve factual disputes hinging on credibility determinations.").

The trial court provided this Court with a detailed decision containing explicit findings of fact and credibility findings. In its consideration of whether the aggregated facts support termination, the Majority Opinion relies heavily on some of those findings, while appearing to disregard others. But due to the standard of review applicable here, this Court must walk a fine line between performing a de novo review of the weight of the combined evidence, while also giving the trial court appropriate deference for its factual and credibility findings. My concern is that the Majority Opinion is mostly unable to point to the specific evidence that undermines the trial court's credibility determinations that would allow a modification of the trial court's factual findings. Thus, in my estimation, the Majority Opinion steps over this line by considering the combination of these modified facts.

We must also keep in mind the ramifications of this case and the standard of review that we are required to apply as a result. As we have explained, in a termination action, "the stakes are so profoundly high" because "[n]o civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Audrey S.*, 182 S.W.3d at 860–61. Consequently, we can only conclude that a child's best interest is served by termination when the combination of all the underlying facts, in the aggregate, "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.* at 861.

Here, giving the trial court's factual and credibility findings their due deference, the factors both for and against termination are equal. Petitioners bore the burden to provide clear and convincing evidence that the Child's best interest required termination of Father's parental rights. Although they effectively established that Father's behavior during his relationship with Mother may have rendered him unfit to parent the Child in years past, Petitioners presented no such evidence establishing Father's present inability. And while Father's past behavior was atrocious and he has not fully atoned or accepted responsibility for that behavior, his conduct, as found by the trial court based on the evidence provided, shows that he has made progress toward becoming a better parent and partner. *See In re Mariah H.*, No. E2016-02091-COA-R3-PT, 2017 WL 2829820, at *15 (Tenn. Ct. App. June 30, 2017) (affirming the trial court's finding that the father's "actions speak louder

- 8 -

than words"). As a result, I agree with the trial court's determination that Petitioners have not met their burden. I simply lack the strong conviction that severing Father's ties to this very young child permanently and forever is in her best interest. I must therefore respectfully dissent from the Majority Opinion.


s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE